LANDOIL RESOURCES
CORPORATION,
Plaintiff,

v.

ALEXANDER & ALEXANDER SERVICES INC., Alexander & Alexander Inc., and Alexander & Alexander of New York Inc., Defendants.

ALEXANDER & ALEXANDER SERVICES INC., Alexander & Alexander Inc., and Alexander & Alexander of New York Inc., Third–Party Plaintiffs,

v.

CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON SUBSCRIBING TO INSURANCE AGREEMENT MA8255049 and an Unnumbered Insurance Agreement With an Effective Date of July 1, 1982, Sedgwick International Limited and/or Sedgwick Marine Limited and/or Other Entities in the Sedgwick Group P.L.C., Third–Party Defendants.

No. 87 Civ. 8133 (WK)

United States District Court,
S.D. New York.

Oct. 11, 1989.

of the foregoing discussion, this Court is of the view that an evaluation of such must await a

Rayner M. Hamilton, White & Case, New York City, for plaintiff.

Thomas W. Hyland, Wilson, Elser, Moskowitz Edelman & Dicker, New York City, for defendants/third-party plaintiffs.

John M. Woods, Thatcher Proffitt & Wood, New York City, for third-party defendant Syndicate 317.

George Weisz, Cleary, Gottlieb, Steen & Hamilton, New York City, for third-party defendants Sedgwick International Limited and Sedgwick Marine Ltd.

AMENDED MEMORANDUM & ORDER

WHITMAN KNAPP, District Judge.

Defendants Alexander & Alexander Services, Inc., *et al.* ("A & A"), have asserted third-party claims for indemnification and contribution against the Lloyd's underwriters alleged to have subscribed to the insur-

motion for summary judgment.

ance policies at issue in the direct action (collectively "Underwriters"),[1] as well as against Sedgwick International Limited, Sedgwick Marine Limited and "Other Entities in the Sedgwick Group p.l.c.," (collectively "Sedgwick"),[2] a Lloyd's brokerage concern claimed to have been involved in a critical phase of the relevant events. All third-party defendants have now moved to dismiss the third-party complaint for lack of personal jurisdiction.[3] This memorandum deals only with the motion of the Underwriters, which, for reasons that follow, is denied.

## DISCUSSION

As an initial matter, since we see no basis for asserting jurisdiction under the transactional provisions of CPLR § 302, there is no need to review the course of dealings between the various parties that led to this lawsuit. The only issue warranting discussion is whether the Underwriters are "doing business" in New York within the meaning of CPLR § 301 in a manner sufficient to make assertion of jurisdiction consistent with due process.

The difficulty in determining the availability of personal jurisdiction over the Underwriters arises, perhaps by design, from the unique manner in which the Lloyd's insurance market operates. Lloyd's underwriters subscribe to risks in their individual capacities, but operate through numbered syndicates, which in turn conduct their affairs through managing agents who accept or decline risks, collect premiums, pay out profits and losses, and maintain the syndicate's records. The various syndicates conduct all of their underwriting business at the central Lloyd's building in London. Indeed, in the traditional sense of the phrase, they do not themselves "do business" anywhere except in London. Insurance business may be brought to these underwriting syndicates only by registered Lloyd's brokers, who have been appointed either by the prospective insured or by the insured's non-Lloyd's broker. The Lloyd's broker prepares a "slip" for submission to any number of managing agents, setting forth the risk to be insured. Any managing agent wishing to underwrite all or a portion of the risk so indicates by initialing the slip and stating the percentage. Once the entire risk has been subscribed, the broker issues to its principal a "cover note," indicating that the insurance has been placed. Some time after the placement of the insurance, pursuant to express authorization from the individual underwriters, the Corporation of Lloyd's issues a policy through its Lloyd's Policy Signing Office in London, listing the numbers of the subscribing syndicates and the percentage of the risk that each has underwritten.[4]

1. Of the Underwriters named in the caption of the third-party action, only Lloyd's Syndicate 317 purports to appear and move, due to a dispute over the scope of A & A's service of process on the Underwriters. Since, as we observed at oral argument, all of the Underwriters are appearing on the motion in fact if not in law, it is unnecessary for us to resolve this dispute at this juncture.

2. Only third-party defendants Sedgwick International Limited and Sedgwick Marine Limited have appeared and moved; there are presently no "Other Entities in the Sedgwick Group p.l.c." before us.

3. Sedgwick also moves to dismiss on grounds of *forum non conveniens,* and moves in the alternative for severance of the claims against them.

4. It bears noting that if this action were based on an insurance policy issued to a New York resident, the fact that under the above-stated scenario all underwriting activities took place in London would not prevent assertion of jurisdiction on a theory of "doing business" in New York. *See* New York Insurance law § 1213; *McGee v. International Life Insurance Co.* (1957) 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223. However, as the New York Court of Appeals has stated: "In adopting § 59–A of the Insurance Law [the predecessor of § 1213] ... the legislature has defined 'doing business' in New York by an insurer in terms more broadly inclusive than those applied to other commercial enterprises by CPLR § 301." *Ford v. Unity Hospital* (1973) 32 N.Y.2d 464, 470, 346 N.Y.S.2d 238, 242, 299 N.E.2d 659, 662. The negative inference is that for purposes of a suit that is *not* based on a policy issued to a New York resident, the New York legislature has not envisioned that an insurance company could be subjected to jurisdiction simply on the basis of its general practice of issuing insurance policies to New York residents, but instead has intended that the more restrictive "doing business" analysis of CPLR § 301 be applied in the same manner it is applied to any type of business.

The Corporation of Lloyd's is a non-profit corporation, created by Special Act of Parliament in 1871, which itself does no underwriting, but instead provides services to the member underwriters at Lloyd's. One of its administrative departments is the Finance & Market Services Group ("FMSG"), which administers the American Trust Fund, a fund held in trust by it and the Corporation of Lloyd's as security for Lloyd's policies issued to American insureds. As of December 31, 1988, the American Trust Fund had $9.4 billion dollars on deposit at Citibank in New York. Although the Underwriters neither deposit directly into the American Trust Fund nor are able to draw directly from it, a portion of their premium income derived from underwriting of American risks is deposited in the Fund through various complex accounting arrangements.[5]

One of the essential business purposes that the American Trust Fund serves is to enable New York insurance brokers and insurance companies to do business with Lloyd's underwriting syndicates, which are not "authorized" to write insurance in New York. A New York insurance broker is prohibited from placing insurance with an unauthorized insurer unless it has ascertained, *inter alia,* that such insurer maintains a trust fund at a New York bank, in an amount specified by regulation, as security for the insured. 11 N.Y.C.R.R. § 27.5(a)(1)(ii). Similarly, a New York insurance company may neither count as an asset nor credit against its loss reserves any obligation reinsured with an unauthorized alien insurer, unless such alien insurer maintains a trust fund at a New York bank in a similarly specified amount. 11 N.Y.C.R.R. § 125.4(c). Thus, although these regulations impose obligations only on entities licensed by the New York State

Insurance Department, their effect is to make it practically impossible for unauthorized insurers, such as Lloyd's underwriters, to avail themselves of the New York insurance-purchasing market without establishing the required trust funds in New York banks. The Underwriters could not, contrary to their assertion, achieve the same enabling effect by maintaining their own account in London.

It is clear from the foregoing that FMSG, by managing the Fund which is on deposit with a New York bank, is performing a service in New York which is an essential prerequisite to whatever New York underwriting the Underwriters may undertake. Since, as above indicated, the assets of the Fund are in the billions of dollars, we may infer that this underwriting business is substantial. It follows that the Underwriters are "doing business" in New York under the doctrine established in *Frummer v. Hilton Hotels Int'l, Inc.* (1967) 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851, *cert. denied* (1967) 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266,[6] and that due process is in no way offended by New York's exercise of jurisdiction over them. *International Shoe Co. v. Washington* (1945) 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95. *See also Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528; *Hanson v. Denckla* (1958) 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283.

We recognize that there is no specific evidence in the record of the exact amount that the various Underwriters before us contribute to the Fund, or of the percentage of American underwriting business that is transacted in New York. As to the first consideration we gather from the general drift of the arguments by all parties

5. The Underwriters' argument that there may be some significance to the fact their money finds its way into the Fund by those complicated arrangements rather than by direct deposit borders on the frivolous.

6. The Underwriters' citation to *Bobe v. Lloyds* (2nd Cir.1928) 27 F.2d 347 does not dictate a different result. *Bobe* was an action on a policy issued by a Lloyd's underwriting syndicate to a New York insured, and the issue was whether

the Corporation of Lloyd's was acting as the syndicate's "treasurer" through maintenance of the trust fund in New York, within the meaning of a statute providing that jurisdiction could be obtained by service of process on such a "treasurer." *Bobe* had nothing to do with whether or not a syndicate could—through the Corporation's activities in New York—be deemed to be "doing business" there under doctrines that had not yet begun to be developed.

that these Underwriters' contributions to the Fund are substantial. As to the second, we take judicial notice (perhaps chauvinistically) that a substantial portion of all American insurance business is transacted in New York. If any Underwriter wishes to challenge either of these assumptions, we will entertain a motion for reargument if served and filed within 30 days of this memorandum and order.

## CONCLUSION

The motion of third-party defendant Underwriters to dismiss the third-party complaint for lack of personal jurisdiction is denied.

SO ORDERED.