**ALEXANDER & ALEXANDER SERVICES, INC., Alexander & Alexander, Inc., and Alexander & Alexander of New York, Inc., Third–Party Plaintiffs–Appellees,**

v.

**LLOYD'S SYNDICATE 317, Third–Party Defendant–Appellant.**

**Docket No. 89–9231.**

United States Court of Appeals, Second Circuit.

April 18, 1990.

Before KAUFMAN, FEINBERG and WALKER, Circuit Judges.

### ORDER

On consideration of the briefs and records and the oral argument in this appeal, it is hereby ORDERED that the Clerk of the Court transmit to the Clerk of the New York Court of Appeals a Certificate in the form attached, together with a complete set of the briefs, appendix, and record filed by the parties with this court.

### UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 89–9231

Filed April 18, 1990

ALEXANDER & ALEXANDER SERVICES, INC., ALEXANDER & ALEXANDER, INC., and ALEXANDER & ALEXANDER OF NEW YORK, INC., *Third–Party Plaintiffs–Appellees,*

—against—

LLOYD'S SYNDICATE 317, *Third–Party Defendant–Appellant.*

Certificate to The New York Court of Appeals (pursuant to McKinney's Revised 1990 New York Rules of Court § 500.17(b)—certification of unsettled question of state law)

Alexander & Alexander Inc. is a Maryland corporation with its principal place of business in Maryland; Alexander & Alexander of New York Inc. is a New York corporation engaged, among other things, in the insurance brokerage business; Alexander & Alexander Services Inc. is a Maryland corporation with its principal place of business in Maryland. (All three corporations are referred to hereafter as Alexander.) Lloyd's Syndicate 317 (Syndicate 317) is a group of insurance underwriters who conduct their underwriting business in the insurance marketplace known as "Lloyd's of London," located in London, England. Landoil Resources Corporation (Landoil) is a Philippines corporation with its principal place of business in the Philippines. During the relevant period, Landoil's activities included the provision of a comprehensive range of contracting, management and construction services on large public and private projects in Third World and Middle Eastern countries.

An overview of the unique manner in which Lloyd's insurance market operates is necessary background. All underwriting at Lloyd's is performed by the underwriting members of Lloyd's in their individual capacities. These individual underwriting members transact their business in groups called syndicates. The syndicates are managed by managing agents, who, among other things, accept or reject the risks submitted for underwriting, collect premiums, pay losses and disburse all funds. The various syndicates conduct all of their underwriting business at the central Lloyd's building in London. Insurance business may be brought to these underwriting syndicates only by registered Lloyd's brokers, who have been appointed either by the prospective insured or by the insured's non-Lloyd's broker. The Lloyd's broker prepares a "slip" for submission to any number of managing agents, setting forth the risk to be insured; any managing agent who wishes to underwrite all or a portion of the risk indicates this on the slip; once the entire risk has been subscribed, the broker informs its principal that the insurance has been placed; and subsequently, the Corporation of Lloyd's (a nonprofit cor-

poration created by a Special Act of Parliament) issues a policy through its Policy Signing Office in London.

The Corporation of Lloyd's itself does no underwriting, but instead provides services to the member underwriters at Lloyd's. One of its administrative departments is the Finance & Market Services Group (FMSG), which administers the American Trust Fund (the Fund), a fund held in trust by it and the Corporation of Lloyd's as security for Lloyd's policies issued to American insureds. As of December 31, 1988, the Fund had $9.4 billion dollars on deposit at Citibank in New York. Although the underwriters neither deposit directly into the Fund nor are able to draw directly from it, a portion of their premium income derived from the underwriting of American risks is deposited in the Fund through various complex accounting arrangements. We were told at oral argument that the Fund is "fairly active" in paying out claims. The Fund enables New York insurance brokers and insurance companies to do business with Lloyd's underwriting syndicates, which are not authorized to write insurance in New York.

A New York insurance broker is prohibited from placing insurance with an unauthorized alien or foreign insurer unless it has ascertained, among other things, that such insurer maintains a trust fund at a New York bank, in an amount specified by regulation, as security for the insured. 11 N.Y. C.R.R. § 27.5(a)(1)(ii). Similarly, a New York insurance company may neither count as an asset nor credit against its loss reserves any obligation reinsured with an unauthorized alien insurer, unless such alien insurer maintains a trust fund at a New York bank in a similarly specified amount. 11 N.Y.C.R.R. § 125.4(c).

The policies at issue here were obtained in accordance with these customary practices. Alexander acted as insurance broker for Landoil in obtaining two political risk insurance policies for Landoil's projects in the Middle East and Africa in 1982 and 1983. Because Alexander is not a registered Lloyd's broker, the policies were negotiated between Alexander's Lloyd's broker subsidiary and certain Lloyd's underwriters, with all communications taking place in London. Although disputes arose regarding alleged losses under both policies, a settlement of all the disputes under both policies was reached between Landoil and certain underwriters at Lloyd's following arbitration proceedings in London, to which Alexander was not a party.

In November 1987, after Landoil settled with its underwriters, it commenced the underlying direct action here against Alexander in the United States District Court for the Southern District of New York, alleging, among other things, breach of contract and fraud and misrepresentation. In January 1989, Alexander filed a third-party complaint against, among others, certain Lloyd's underwriters, including Syndicate 317, alleged to have subscribed to the political risk insurance policies at issue in the direct action. Alexander sought indemnification and contribution from some 62 (we are told) underwriting syndicates. Due to a dispute over the scope of Alexander's service of process only Syndicate 317 (of the underwriters sued in the third-party action) purported to appear, and only it moved the district court to dismiss the third-party complaint for lack of personal jurisdiction. In ruling on the motion, Judge Whitman Knapp found it unnecessary to then resolve that dispute, considering all of the underwriters to be appearing on the motion in fact if not in law, and on appeal appellant Syndicate 317 concedes that the motion is in effect a test case for the other Lloyd's underwriters.

In an amended memorandum and order, reported at 720 F.Supp. 26, the district court denied the motion to dismiss, holding that Syndicate 317 was "doing business" in New York within the meaning of New York CPLR § 301. The district court emphasized that FMSG, by managing the Fund on deposit with a New York bank, was performing a service in New York which was an essential prerequisite to whatever New York underwriting Syndicate 317 might undertake, and the district court inferred, on the basis of the total assets of the Fund, that this underwriting business was substantial. The district

court, noting that there was no specific evidence in the record of the exact amount of premiums attributable to risks insured by specific underwriters or of the percentage of American underwriting business that is tied to the Fund and transacted in New York, assumed that both were substantial, but expressed its willingness to entertain a motion for reargument if any underwriter wished to challenge either of these assumptions. No such motion was made, and on appeal Syndicate 317 maintains that the amount of its contribution to the Fund and the number of its policies insuring New York risks are irrelevant to the proper jurisdictional analysis.

In November 1989, the district court, upon a motion by Syndicate 317, certified the issue of personal jurisdiction for immediate appeal to this court pursuant to 28 U.S.C. § 1292(b), and in December 1989 this court granted the petition of Syndicate 317 for leave to appeal.

The parties have cited no New York case, and this court has found none, addressing the precise issue before us: whether a foreign syndicate of insurance underwriters may be subject to suit in New York courts on the basis of a trust fund on deposit at a New York bank, into which a portion of the underwriters' premium income derived from the underwriting of New York risks is deposited, and without which, under New York insurance law, New York licensed insurance brokers and companies could not do business with that syndicate.

Syndicate 317 argues that it is not "doing business" pursuant to CPLR § 301, because under *Bryant v. Finnish National Airline,* 15 N.Y.2d 426, 429–31 [260 N.Y.S.2d 625, 208 N.E.2d 439] (1965), FMSG's maintenance of the Fund does not involve Syndicate 317 in substantial solicitation that is carried on with a considerable measure of continuity and from a permanent locale within the state, and, further, because under *Frummer v. Hilton Hotels Int'l,* 19 N.Y.2d 533, 537 [281 N.Y.S.2d 41, 227 N.E.2d 851] cert. denied, 389 U.S. 923 [88 S.Ct. 241, 19 L.Ed.2d 266] (1967), the traditional criteria for doing business in New York are not satisfied. Syndicate 317

argues that it does not solicit business in New York; it does not have an office in New York; it has no real or personal property or traditional bank accounts in New York; and it has no employees or agents in New York. Syndicate 317 further contends that the maintenance of a bank account in New York is insufficient grounds to assert in personam jurisdiction over a foreign corporation under New York law, citing *Nemetsky v. Banque de Developpement de la Republique du Niger,* 48 N.Y.2d 962, 964 [425 N.Y.S.2d 277, 401 N.E.2d 388] (1979) (mem.) (correspondent bank relationship).

Alexander argues, also citing *Frummer,* that Syndicate 317 is doing business pursuant to CPLR § 301. Alexander principally contends that Syndicate 317 insures New York risks and the enormous trust fund on deposit in New York is a prerequisite to any business Syndicate 317 conducts with regard to New York insureds; the Fund, unlike a correspondent banking relationship, is maintained for the benefit of Lloyd's underwriters, including Syndicate 317; and the maintenance of the Fund is so essential to the underwriting of New York risks by Syndicate 317 that if FMSG did not perform this function, Syndicate 317 would have to do so. The unsettled question that should be decided by the New York Court of Appeals is as follows:

Whether in this case the existence of a trust fund totalling $9.4 billion on deposit at a New York bank and managed by an administrative department of a foreign corporation serving insurance underwriting members suffices to constitute "doing business" by a syndicate of such insurance underwriting members for purposes of CPLR § 301, where the maintenance of the Fund permits New York brokers and insurance companies to conduct business with the syndicate in accordance with New York insurance regulations, 11 N.Y.C.R.R. §§ 27.5(a)(1)(ii) & 125.4(c), and where a portion of the underwriters' premium income derived from the underwriting of New York risks is deposited in the trust fund.

This question, one of first impression, should be decided by the New York court

because it directly involves the application of an important public policy of the State of New York, since that state has a strong interest in deciding the jurisdictional reach of its courts. The question certified should be addressed "at this time," New York Rules of Court § 500.17(b), because if jurisdiction under CPLR § 301 is lacking, the litigation between these parties will come to an end. Cf. *Leasco Data Processing Equip. v. Maxwell*, 468 F.2d 1326, 1330 (2d Cir.1972) (leave to appeal granted pursuant to 28 U.S.C. § 1292(b) on certified question of personal jurisdiction). The question is obviously important not just to Syndicate 317, but also to the over 60 underwriting syndicates also sued. Moreover, according to Syndicate 317, the district court opinion would expose a foreign party to jurisdiction in New York for all claims asserted against it simply because a bank with which it deals is located within that forum. Even if this claim is too broadly stated, it is arguable that under the district court opinion the New York courts will become a forum for suits against any unauthorized alien or foreign insurer who benefits from the existence of a trust fund in a bank located in New York in accordance with the New York insurance regulations referred to above. There is no direct precedent on the issue now before us and New York has a strong interest in deciding the issue certified rather than having the only precedent on point be that of a federal court, which may be mistaken.

The question herein presented is likely to recur, and its resolution at this time by the New York Court of Appeals would aid in the administration of justice.

The foregoing is hereby certified to the Court of Appeals for the State of New York as ordered by the United States Court of Appeals for the Second Circuit.

Dated at New York, N.Y., this 18th day of April, 1990.

/s/ Elaine B. Goldsmith
Clerk of the United States Court
of Appeals for the Second Circuit