ROLLS–ROYCE MOTOR CARS, INC., Plaintiff,

v.

Michael SCHUDROFF, BBS Automotive Group, Inc., Carriage House Motor Cars, Ltd., Autostyle Leasing, Ltd., Carriage House Motor Cars of Greenwich, Ltd., Glen Ethe, Cole Roberts & Herbert, Jeffrey E. Cole, Edward S. Cole and Howard Bernstein, Defendants.

CARRIAGE HOUSE MOTOR CARS, LTD., Counterclaimant,

v.

ROLLS–ROYCE MOTOR CARS, INC., Counterclaim Defendant.

No. 95 Civ. 2291 (MBM).

United States District Court, S.D. New York.

May 23, 1996.

Joseph L. Buckley, Richard J. Schulman, A. Ross. Pearlson, and Jennifer L. Borofsky, Sills Cummis Zuckerman Radin Tischman Epstein & Gross, P.C., New York City, for Plaintiff.

Robert Polifka, Dean R. Nicyper, Andrea Ziegelman, Randall Packer, and Yael Weinman, Flemming Zulack & Williamson, L.L.P., New York City, for Defendants Schudroff, Ethe, BBS, Autostyle, Carriage House, and Carriage House of Greenwich.

## OPINION AND ORDER

MUKASEY, District Judge.

Rolls–Royce Motor Cars, Inc. has sued one of its former dealers, Carriage House Motor Cars, Ltd., and several affiliated parties for damages arising from transactions involving 15 luxury automobiles. Defendants have moved to dismiss most of the 23 claims asserted in the complaint for failure to state a claim upon which relief can be granted, Fed. R.Civ.P. 12(b)(6), and have moved for summary judgment on one claim. Fed.R.Civ.P. 56. For the reasons stated below, defendants' motion is granted in part and denied in part.

### I.

The allegations in the complaint, which are accepted as true on this motion, are as follows: Plaintiff Rolls–Royce, a Delaware corporation operating principally in Paramus, New Jersey, is the exclusive United States importer and distributor of Rolls–Royce and Bentley automobiles. Carriage House is a New York corporation. At the time of the transactions at issue here, Carriage House maintained its principal place of business on Manhattan's Upper East Side. Carriage House is a wholly owned subsidiary of Autostyle Leasing, Ltd., another New York corporation. Autostyle is owned by Michael Schudroff and Glen Ethe. On March 23, 1983, Carriage House became an authorized dealer of Rolls–Royce and Bentley luxury cars pursuant to a standardized dealer agreement with Rolls–Royce. (Compl. ¶¶ 1–3 & Ex. A) Over the following decade, Carriage House operated one of the most successful Rolls–

Royce and Bentley dealerships in the United States. (*Id.* ¶ 17)

Toward the end of the calendar years 1989, 1990, 1991, and 1992, Rolls–Royce agreed to sell automobiles to Carriage House on terms other than the cash-on-delivery ("C.O.D.") terms customary between the parties and in the industry. In December of each of those years, Rolls–Royce delivered cars and their accompanying manufacturer's statements of origin to Carriage House in exchange for checks in the amount of the purchase price of each vehicle. However, Rolls–Royce agreed not to present the checks for payment until after the first of the new year. (*Id.* ¶ 19)

In late 1993, the parties again agreed to transact business on those terms. Between December 10, 1993 and January 6, 1994, Rolls–Royce delivered two Rolls–Royces and 11 Bentleys to Carriage House's Manhattan storage facility. Carriage House delivered 13 checks to Rolls–Royce in payment for the cars. Rolls–Royce agreed not to deposit the checks until January 14, 1994, in reliance on oral assurances from Schudroff and Ethe that there would be sufficient funds in Carriage House's accounts to cover the checks on that date, and on an unaudited Carriage House financial report dated November 1993 which showed "a substantial positive net worth." (*Id.* ¶¶ 20–21 & Ex. D)

Unbeknownst to Rolls–Royce, Carriage House was insolvent at the time of the above-described transactions and was scrambling to satisfy obligations to other creditors. Some time after receiving the vehicles from Rolls–Royce, Carriage House transferred at least three of them to Autostyle, which pledged them as collateral for a loan from Gotham Bank of New York. Pursuant to an outstanding loan agreement with National Westminster Bank, the remaining cars automatically became collateral for Carriage House's indebtedness to that bank. All of the cars eventually were sold to consumers at various times in 1994. (Compl. ¶¶ 14, 23)

On January 14, 1994, Carriage House informed Rolls–Royce that Carriage House's bank accounts did not hold sufficient funds to cover the 13 checks issued the previous month. In February 1994, Rolls–Royce met with Carriage House and the company's accountants, Cole, Roberts & Herbert, to discuss the situation. Representatives of Cole, Roberts informed Rolls–Royce that Carriage House was insolvent and had been "for quite some time." (*Id.* ¶¶ 26–28)

In August 1994, Schudroff and Ethe used the proceeds from the sale of the 13 cars to form BBS Automotive Group, Inc. and Carriage House Motor Cars of Greenwich, Ltd.[1] The latter was to operate a new luxury car dealership in Connecticut. Sometime that fall, Schudroff advised Rolls–Royce that Carriage House intended to close its Manhattan showrooms. By letter dated March 2, 1995, Rolls–Royce informed Schudroff that Carriage House would be terminated as an authorized dealer effective March 18, 1995. (*Id.* ¶¶ 30–31)

Rolls–Royce alleges that Carriage House of Greenwich has used the Rolls–Royce and Bentley trademarks without authorization, and has falsely advertised itself as an authorized dealer of Rolls–Royce and Bentley automobiles. (*Id.* ¶¶ 32–44 & Exs. F–K)

Rolls–Royce also alleges that Carriage House failed to pay for two other cars. In July 1992, Rolls–Royce delivered a used Bentley convertible to Carriage House for the temporary use of a customer awaiting delivery of a new car. In September 1993, Carriage House received a different used Bentley from a customer who traded the car in for a new vehicle. Carriage House agreed to sell the two used Bentleys and pay a total of $415,000 out of the sale proceeds to Rolls–Royce. Rolls–Royce alleges that Carriage House sold both cars in 1994 but never remitted any of the proceeds. (*Id.* ¶¶ 24–25)

Plaintiff filed this action in April 1995. The complaint is more Rube Goldberg than Rolls–Royce, transforming this elegantly simple two-party contract dispute into a dizzily complex multi-party tort litigation. The complaint names as defendants Carriage House, Schudroff, Ethe, Autostyle, BBS, Carriage House of Greenwich, the Cole, Roberts accounting firm, and three Cole, Roberts

---

1. In this opinion, "Carriage House" refers to the New York corporation and dealership, and "Carriage House of Greenwich" refers to the Connecticut corporation and dealership.

accountants. The complaint lists 23 claims for relief. The first seven claims are styled (1) common law fraud, (2) negligent misrepresentation, (3) conversion, (4) breach of contract, (5) account stated, (6) "claim by payee against drawer of checks," and (7) fraudulent conveyance. Claims (8)–(15) arise under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* (1994), and the substantially similar New Jersey RICO statute, N.J.Stat. Ann. § 2C:41–1 *et seq.* (West 1982). The remaining claims are for (16) unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125 (1994), (17) trademark infringement under 15 U.S.C. § 1114 (1994), (18) common law trademark infringement, (19) common law unfair competition, (20) trademark dilution under N.Y.Gen.Bus.Law § 368–d (McKinney 1984), (21) a declaration that Rolls–Royce validly terminated its dealer agreement with Carriage House, (22) accountant malpractice,[2] and (23) "attorneys' fees under dealer agreement." [3]

Carriage House has filed four counterclaims, for (1) breach of contract, (2) tortious interference with contract rights, (3) breach of the implied covenant of good faith and fair dealing, and (4) tortious interference with prospective economic advantage. All defendants except the accountants have moved to dismiss most of the claims [4] for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). Defendants seek summary judgment under Fed.R.Civ.P. 56 on plaintiff's fraudulent conveyance claim.

## II.

This court has subject matter jurisdiction over the federal claims pursuant to 18 U.S.C. § 1964(c) (1994) (RICO), 28 U.S.C. § 1338 (1994) (federal trademark claims), and 28 U.S.C. § 1331 (1994) (general federal question statute). Subject matter jurisdiction for the state law claims is premised on principles of supplemental jurisdiction as codified in 28 U.S.C. §§ 1338, 1367 (1994).

A motion to dismiss under Rule 12(b)(6) tests the facial legal sufficiency of the complaint. On this motion, the court accepts the allegations in the complaint as true and draws all reasonable inferences in favor of the non-movant. *Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991). The motion should be granted only when it appears beyond doubt from an examination of the complaint that the plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

## III.

A. *Sufficiency of Plaintiff's Alter Ego Allegations*

As a threshold matter, defendants contend that Rolls–Royce cannot recover on all claims against all defendants. For example, defendants argue that only Carriage House can be liable to Rolls–Royce for breach of contract, because none of the other defendants were parties to the dealer agreement. (Def.Mem. at 33; similar arguments, as applied to other claims, appear in parts V, VI, X, and XII of defendants' Memorandum of Law.) Rolls–Royce insists that Schudroff, Ethe, Carriage House, Carriage House of Greenwich, BBS, and Autostyle are for most purposes interchangeable as defendants because those entities and individuals are alter egos of one another. Carriage House responds that the complaint's alter ego allegations are conclusory and insufficient.

New York courts will disregard the corporate veil and permit creditors of a corporation to recover from the corporation's owners "*either* when there is fraud *or* when the corporation has been used as an alter ego...." *Itel Containers Int'l Corp. v. At-*

---

**2.** Rolls–Royce asserts malpractice only against Cole, Roberts and three of the firm's accountants, Jeffrey Cole, Edward Cole, and Howard Bernstein.

**3.** Rolls–Royce premises its claim for attorneys' fees on a provision of its dealer agreement with Carriage House. Accordingly, the twenty-third claim for relief properly is viewed as part of the breach of contract claim.

**4.** Defendants do not seek dismissal of the claims against Carriage House for breach of contract, account stated, and attorney's fees, and the claim for a declaratory judgment.

*lanttrafik Express Serv. Ltd.,* 909 F.2d 698, 703 (2d Cir.1990) (emphasis in original). To establish that an entity is the alter ego of its parent owners, a plaintiff must allege and prove "(1) that the parent exercised such complete domination in respect to the transaction attacked that the subsidiary had at that time no separate will of its own, and (2) that this domination was used to commit fraud or wrong against the plaintiff...." *Zinaman v. USTS New York, Inc.,* 798 F.Supp. 128, 132 (S.D.N.Y.1992) (citations and quotation marks omitted). Under the alter ego theory, it is sufficient to prove that complete domination was used to commit fraud *or* wrong. Thus, a veil-piercing claimant can prevail without proving fraud if the claimant can identify some non-fraudulent "wrong" attributable to the defendant's complete domination of a subsidiary entity. *See Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,* 933 F.2d 131, 138 (2d Cir.1991).

New York courts generally are reluctant to pierce the corporate veil under any theory. *Itel,* 909 F.2d at 703. But because a veil piercing claimant can prevail without proving fraud, plaintiff's alter ego allegations will not be held to the particularity requirement of Fed.R.Civ.P. 9(b). Instead, the allegations properly are judged according to the liberal "notice pleading" standard of Fed. R.Civ.P. 8(a), which requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *See Citicorp Int'l Trading Co. v. Western Oil & Refining Co.,* 771 F.Supp. 600, 608 (S.D.N.Y. 1991); *see also Chicago Dist. Council of Carpenters Pension Fund v. Ceiling Wall Sys., Inc.,* 915 F.Supp. 939, 942–43 (N.D.Ill.1996) ("because fraud is not a prerequisite to piercing the corporate veil, Rule 9(b) does not apply to alter ego allegations"); *Laborers Combined Funds of Western Pennsylvania v. Ruscitto,* 848 F.Supp. 598, 600–01 (W.D.Pa.1994) (Rule 8(a) applies to alter ego allegations "unless fraud is a necessary element of the claim").

Plaintiff alleges that "Autostyle dominates, controls and operates Carriage House ... as its agency, instrumentality and *alter ego,* and is therefore liable for Carriage House['s] corporate obligations." (Compl. ¶ 3) Plaintiff also alleges that Carriage House of Greenwich is an alter ego of Carriage House, Autostyle, Schudroff, and Ethe (*id.* ¶ 4), and that BBS is the corporate successor to and/or alter ego of Carriage House, Autostyle, Carriage House of Greenwich, Schudroff, and Ethe. (*Id.* ¶ 5) The complaint charges that Schudroff and Ethe used their control over the corporate entities to hide assets from creditors. For example, plaintiff alleges that Schudroff and Ethe transferred the proceeds from the sale of the cars from Carriage House to BBS in order to prevent Carriage House's creditors from reaching those funds. (*Id.* ¶ 30)

Those allegations are sufficient under the lenient standards of Rules 8(a) and 12(b)(6). Plaintiff has alleged the fact of complete domination and the use of that domination to commit a wrong against creditors. Unlike the plaintiff in the *Zinaman* case cited above, plaintiff here did not state merely that one entity "owns and controls" another. *See Zinaman,* 798 F.Supp. at 132 (veil piercing allegations did not withstand motion to dismiss under Rule 12(b)(6)). Allegations similar to plaintiff's were deemed sufficient to withstand a motion under Rule 12(b)(6) in the *Western Oil* case cited above. There the plaintiffs claimed that a subsidiary of Citibank made errors in processing letters of credit for the plaintiffs, causing the collapse of a lucrative business transaction, and sought recovery from Citibank. Those plaintiffs alleged little more than that the subsidiary "was a mere instrumentality of Citibank and was so dominated by Citibank as to have no will of its own or ability to answer for itself." 771 F.Supp. at 608. The Court acknowledged that the plaintiffs' allegations were conclusory, but explained that "[i]t is inappropriate at this stage of the pleadings to attempt to evaluate the evidence or to determine whether the [plaintiffs] will ultimately succeed in supporting their allegations." *Id.*

Because plaintiff has adequately alleged alter ego liability, it is not necessary at this time to ascertain which defendants ultimately can be held liable on each claim. Schudroff, Ethe, Autostyle, BBS, Carriage House, and

Carriage House of Greenwich will remain as defendants on all surviving claims except for the claim for accountant malpractice.

### B. *Redundancy of Plaintiff's Fraud, Negligent Misrepresentation, and Conversion Claims*

Defendants argue that plaintiff's fraud, negligent misrepresentation, and conversion claims must be dismissed because plaintiff has merely affixed three alternative labels to its breach of contract claim.

■ Much has been written about the proliferation of tort duties arising from contractual relationships. *See, e.g.,* Grant Gilmore, *The Death of Contract* 87–103 (1974) (arguing that tort law has eroded classical contract norms). Nevertheless, it is well settled in New York that "mere allegations of breach of contract do not give rise to a claim for fraud or fraudulent inducement...." *Sudul v. Computer Outsourcing Servs.*, 868 F.Supp. 59, 61–62 (S.D.N.Y.1994) (citations omitted). A contracting party's "mere promissory statement" that he will live up to his contractual obligations generally cannot be the basis of a fraud claim. *Deerfield Communications Corp. v. Chesebrough–Ponds, Inc.*, 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 89, 502 N.E.2d 1003, 1004–05 (1986).

Notwithstanding that general rule, the New York Court of Appeals held in *Sabo v. Delman*, 3 N.Y.2d 155, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957), that "a promise ... made with a preconceived and undisclosed intention of not performing it, ... constitutes a misrepresentation." 3 N.Y.2d at 160, 164 N.Y.S.2d at 716, 143 N.E.2d at 908. *Sabo* relies on the slippery distinction between a misrepresentation of present fact and a misrepresentation of future intent. *See Deerfield*, 68 N.Y.2d at 956, 510 N.Y.S.2d at 89, 502 N.E.2d at 1004–05; *see also Channel Master Corp. v. Aluminium Ltd. Sales, Inc.*, 4 N.Y.2d 403, 407–08, 176 N.Y.S.2d 259, 262–63, 151 N.E.2d 833, 835–36 (1958) (misrepresentation as to present intention to honor a contractual commitment may give rise to an action for fraud). Under *Sabo*, if a party to a sales contract, for example, falsely states at the time of the sale, "I presently intend to pay for the merchandise," that statement may be actionable as fraud because it is a misrepresentation of present fact. In contrast, if a contracting party falsely states, "I intend in the future to pay for the merchandise," and then simply fails to pay when payment is due, that statement is not actionable as fraud because it is a misrepresentation of future intent. *Id.*

Understandably, courts at times have been vexed by the *Sabo* distinction. Most courts have refused to permit fraud claims arising from contractual relationships unless (1) the claims are premised on a "a separate duty outside the [contract]" or (2) the plaintiff seeks to recover "special damages proximately caused by the alleged false representations that are not recoverable under the contract measure of damages." *Best Western Int'l, Inc. v. CSI International Corp.*, No. 94 Civ. 360, 1994 WL 465905, *5 (S.D.N.Y. Aug. 23, 1994); *see also Sudul*, 868 F.Supp. at 62–63; *McKernin v. Fanny Farmer Candy Shops, Inc.*, 176 A.D.2d 233, 234, 574 N.Y.S.2d 58, 59 (2d Dep't 1991) (fraud claim is redundant if "premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement"). As Judge Martin of this Court has observed, a "long line of New York courts" have held that "where a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract." *Sudul*, 868 F.Supp. at 62. The New York Court of Appeals has not squarely addressed this issue in any recent case. However, in a 1994 decision the Court cited with approval the reasoning of a lower court applying the rule restated by Judge Martin. *See Rocanova v. Equitable Life Assur. Soc. of the United States*, 83 N.Y.2d 603, 614, 612 N.Y.S.2d 339, 343, 634 N.E.2d 940, 944 (1994); *see also Sudul*, 868 F.Supp. at 62 (discussing Court of Appeals' tacit approval of lower court decisions limiting holding in *Sabo* ).

In *Deerfield*, cited above, the Court of Appeals addressed a fraud claim based on

promises not incorporated in a merchandise sales agreement. In an oral agreement not embodied in the contract, the defendant buyer promised to abide by specified geographic restrictions on resale of the merchandise. The Court of Appeals permitted the separate assertion of the fraud claim because the representations in question were collateral to the agreement, and they induced the seller to enter into the agreement. 68 N.Y.2d at 956, 510 N.Y.S.2d at 89, 502 N.E.2d at 1004–05. In other words, the buyer's duty not to misrepresent his willingness to abide by the resale restrictions embodied in the oral agreement was held independent of the buyer's duty to abide by the terms of the sales contract.

■ In contrast, Rolls–Royce does not rely here on promises that were "collateral or extraneous" to the contract. *See Sudul*, 868 F.Supp. at 63. Rolls–Royce alleges merely that representatives of Carriage House falsely stated in late 1993 and early 1994 that Carriage House was able to pay what it owed under the sales contract, and intended to do so. Plaintiff's fraud claim is based on no duty other than the duty to honor contractual promises. Moreover, plaintiff has identified no special damages distinguishable from contract damages; plaintiff seeks only to recover payments due under contracts. Accordingly, plaintiff's fraud claim is redundant and must be dismissed. Because plaintiff's negligent misrepresentation claim is based on the same deficient allegations, that claim too must be dismissed. *See R.H. Damon & Co. v. Softkey Software Prods., Inc.*, 811 F.Supp. 986, 992–93 (S.D.N.Y.1993).

■ Claims for conversion similarly will be deemed redundant when "damages are merely being sought for breach of contract." *Peters Griffin Woodward, Inc. v. WCSC, Inc.*, 88 A.D.2d 883, 884, 452 N.Y.S.2d 599, 600 (1st Dep't 1982). Conversion occurs when a defendant exercises unauthorized dominion over personal property in interference with a plaintiff's legal title or superior right of possession. *Bankers Trust Co. v. Cerrato, Sweeney, Cohn, Stahl & Vaccaro*, 187 A.D.2d 384, 385, 590 N.Y.S.2d 201, 202 (1st Dep't 1992). To state a viable conver-

sion claim here, plaintiff "must allege acts that are unlawful or wrongful as distinguished from acts that are a mere violation of contractual rights." *Fraser v. Doubleday & Co.*, 587 F.Supp. 1284, 1288 (S.D.N.Y.1984).

■ Rolls–Royce transferred title and possession when it delivered the 13 cars, along with their manufacturer's statements of origin, to Carriage House, and accepted checks in payment therefor. (Compl. ¶¶ 19–23) Nevertheless, plaintiff argues that defendants converted the cars. Plaintiff claims that in "transferring the [c]ars to third parties and/or pledging them to secure bank loans" (Pl.Mem. at 36–37), Carriage House interfered with Rolls–Royce's superior right of possession. Plaintiff explains that "Section 4(j) of the Dealer Agreement provides the source of this superior right, by affording [Rolls–Royce] the right to retake possession of automobiles for which a dealer has not paid." (*Id.* at 36, *citing* Compl. ¶ 23)

In identifying the dealer agreement as the source of its allegedly superior right of possession, plaintiff tacitly admits that it is seeking to enforce a contract right, not a right tied to some independent duty under state law. The appropriate remedy for a contracting party's failure to honor its obligations under a contract is an action for breach of contract. Plaintiff's conversion claim, like plaintiff's claims for fraud and negligent misrepresentation, is redundant and must be dismissed.

### C. Claim by Payee Against Drawer of Checks

Through its sixth claim for relief, plaintiff seeks to enforce payment on the checks delivered by Carriage House to Rolls–Royce in exchange for the 13 cars received in December 1993 and January 1994. Defendants argue that plaintiff cannot enforce payment because Rolls–Royce is not a holder in due course; defendants contend that "as a party to the underlying transaction involving the 13 cars, [Rolls–Royce] is presumed to have notice of any alleged claims and defenses on the checks." (Def.Mem. at 36) Further, defendants argue that the claim must be dismissed because Rolls–Royce did not present the

checks for payment to United Jersey Bank until March 7, 1995, over a year after the checks were delivered. *See* N.Y. U.C.C.Law § 4–404 (McKinney 1991) ("A bank is under no obligation ... to pay a check, other than a certified check, which is presented more than six months after its date").

■ Defendants' arguments miss the mark. Even if Rolls–Royce is not a holder in due course, it still may enforce the checks as a simple holder. *See id.* § 3–301 (McKinney 1991) ("The holder of an instrument ... may ... enforce payment in his own name"). Unlike a holder in due course, a simple holder does not enjoy the right to enforce payment free from all defenses except "real" defenses. *See id.* § 3–305. But a holder still may enforce payment subject to "personal" defenses. *Id.* § 3–306.

■ Similarly, the staleness of the checks does not preclude recovery. Under the Uniform Commercial Code as adopted in New York, the drawee *bank* is entitled to refuse to pay a check presented more than six months after the date indicated on the check. *Id.* § 4–404. But staleness does not extinguish the drawer's debt to the holder.

Accordingly, plaintiff's claim for payment on the checks will not be dismissed.

## D. *RICO Continuity*

### 1. Federal RICO Claims

Plaintiff asserts eight racketeering claims. The eighth claim in the complaint is a federal RICO claim arising under 18 U.S.C. § 1962(c).[5] Plaintiff alleges that Schudroff, Ethe, Carriage House, Autostyle, BBS, and Carriage House of Greenwich are RICO "persons" that participated in the affairs of a RICO "enterprise" consisting of an association in fact of those individuals and entities. According to the complaint, the RICO persons associated for the purpose of "improperly obtaining and then converting property— namely thirteen new Rolls–Royce and Bentley automobiles—belonging to [Rolls–Royce] through false and fraudulent pretenses, representations and promises." (Compl. ¶ 81) The claim is based on alleged predicate acts

of mail fraud, wire fraud, and the transportation of stolen cars over state lines. The ninth claim in the complaint is for conspiracy to accomplish the RICO violation alleged in the eighth claim. 18 U.S.C. § 1962(d) (1994).

The tenth claim in the complaint is substantially similar to the eighth claim, except that different individuals and entities are cast as "person" and "enterprise" under § 1962(c). Plaintiff alleges that Schudroff, Ethe, and Autostyle participated in the affairs of a RICO enterprise consisting of an association in fact of Carriage House, Carriage House of Greenwich, and BBS. These RICO persons allegedly associated for the purpose of "obtaining money or property by means of false or fraudulent pretenses, representations or promises that Carriage House ... had or would have sufficient funds to pay for the [c]ars." (Compl. ¶ 100(a)) The tenth claim also is based on alleged predicate acts of mail fraud, wire fraud, and transportation of stolen property across state lines. The eleventh claim in the complaint is for conspiracy to commit the RICO violation alleged in the tenth claim.

The dismissal of plaintiff's fraud and conversion claims deals an all but mortal below to plaintiff's RICO claims, because plaintiff relies on predicate acts involving mail and wire fraud and conversion of the cars. But even if plaintiff could identify valid predicate acts, the RICO claims would fail because plaintiff has not identified a "pattern" of racketeering.

To recover under § 1962(c), a plaintiff must allege and prove that the defendants engaged in a "pattern of racketeering activity." The statute defines a "pattern" as requiring the commission of at least two predicate acts within ten years. 18 U.S.C. § 1961(5) (1994). The Supreme Court has construed the term "pattern" to impose additional requirements. In *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Court held that to establish a "pattern," a plaintiff must show that "the racketeering predicates are related, *and* ... they amount to or pose a

---

5.   18 U.S.C. § 1964(c) establishes a private right

of action for damages for violations of § 1962.

threat of continued criminal activity." *Id.* at 239, 109 S.Ct. at 2900 (emphasis in original).

The first part of the "relatedness plus continuity" requirement is satisfied by proof that the predicate conduct "embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240, 109 S.Ct. at 2901. Defendants do not dispute the relatedness of the conduct alleged in the complaint.

Two types of "continuity" may satisfy the second part of the formula set forth in *H.J., Inc.* First, "[a] party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.* at 242, 109 S.Ct. at 2902. Plaintiff concedes that closed-ended continuity is not alleged in the complaint. (Pl.Mem. at 55) Plaintiff's two § 1962(c) RICO claims involve an alleged scheme to improperly obtain 13 cars on one occasion. Carriage House accomplished that goal by misrepresenting its willingness and ability to pay for the cars in November and December 1993, and then refusing to pay for the cars after they were delivered in January 1994. The complaint alleges that the dispute over the 13 cars followed ten years of harmonious and mutually profitable relations between the parties. Three months is not a "substantial period of time." *See H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. at 2902. (closed-ended continuity is not established by predicate acts occurring over "a few weeks or months"; plaintiff must identify "long-term criminal conduct"); *see also Barrett v. United States Banknote Corp.*, 806 F.Supp. 1094, 1100 (S.D.N.Y.1992) (closed-ended continuity not established where predicate acts occurred over a period of less than one year).

Plaintiff does not allege that Carriage House's acquisition (in 1992 and 1993) and sale (in 1994) of the two used Bentleys was part of the RICO scheme. Plaintiff's claims for trademark infringement and unfair competition similarly do not advance plaintiff's attempt to plead continuity because those are not predicate crimes under RICO. 18 U.S.C. § 1961(1) (1994).

Absent closed-ended continuity, a plaintiff may establish a "pattern" of racketeering activity by demonstrating relatedness plus open-ended continuity. That form of continuity is present when the predicate acts raise "a threat of continued racketeering activity." *H.J., Inc.*, 492 U.S. at 242, 109 S.Ct. at 2902. The Court in *H.J., Inc.* offered the following example as illustrating open-ended continuity:

> Suppose a hoodlum were to sell "insurance" to a neighborhood's storekeepers to cover them against breakage of their windows, telling his victims he would be reappearing each month to collect the "premium" that would continue their "coverage." Though the number of related predicates involved may be small and they may occur close together in time, the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future, and thus supply the requisite threat of continuity.

*Id.* Alternatively, open-ended continuity might be established by proof that the predicate crimes are "part of an ongoing entity's regular way of doing business," as is the case with (1) associations engaged in traditional "organized crime" or (2) "legitimate" businesses that regularly engage in racketeering to promote a lawful ultimate goal. *Id.* at 242–43, 109 S.Ct. at 2902–03.

Plaintiff's RICO claims are premised on conduct posing virtually no threat of continued racketeering activity. As defined by plaintiff, defendants' RICO scheme was a plan to obtain 13 cars without paying for them. (Compl. ¶¶ 81, 100(a)) It is doubtful that this scheme could work more than once. In phase one of the plan, defendants allegedly used the credibility they had built up over 10 years of harmonious dealings with Rolls–Royce to induce delivery of the cars. But once Carriage House informed Rolls–Royce of its insolvency in mid-January 1994, Rolls–Royce was no longer ignorant of Carriage House's inability to pay. The completion of the second phase of the alleged scheme (announcing that the company is insolvent and refusing to pay for the cars) defeated any

renewed attempt to execute the first phase of the scheme (concealing insolvency and promising to pay for a shipment of new cars).

Because the allegations in the complaint do not support an inference of closed or open-ended continuity, plaintiff's § 1962(c) claims must be dismissed. Because plaintiff's § 1962(d) claims allege only that defendants conspired to engage in conduct that does not violate RICO, those claims also must be dismissed.

### 2. New Jersey RICO Claims

The twelfth through fifteenth claims in the complaint arise under New Jersey's RICO Act, N.J.Stat.Ann. 2C:41–1 *et seq.* (West 1982), which is patterned closely on the federal RICO statute. *State v. Ball,* 141 N.J. 142, 661 A.2d 251, 258 (1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 779, 133 L.Ed.2d 731 (1996). Those claims are substantially the same as the eighth through eleventh claims, respectively.

In construing the New Jersey statute, New Jersey courts have not adopted the entire corpus of federal RICO jurisprudence. *See id.,* 661 A.2d at 258. However, the New Jersey Supreme Court recently held in the *Ball* decision cited above that "relatedness" and "continuity" are implicit in the New Jersey statute's "pattern" requirement. The Court preferred to view continuity as an element of relatedness rather than as an analytically distinct requirement, but otherwise approved of the general approach set forth by the United States Supreme Court in the *H.J., Inc.* decision. The New Jersey Court explained that "some degree of continuity, or threat of continuity, is required and is inherent in the 'relatedness' element of the 'pattern of racketeering activity.' " 661 A.2d at 264.

Unlike the federal statute, New Jersey's RICO statute was not designed only to reach "long-term criminal activity." However, the *Ball* Court noted that the New Jersey statute expressly bars reliance on "isolated criminal incidents." *Id.* (*citing* N.J.Stat.Ann. 2C:41–1d(2)). The *Ball* case involved the criminal RICO convictions of participants in an illegal dumping scheme. The participants included haulers who disposed of solid waste at illegal dump sites in northern New Jersey, and corrupt local officials who accepted bribes in return for assisting the scheme. The New Jersey Supreme Court affirmed the convictions, finding that the statute's "pattern" requirement was satisfied by evidence of open-ended continuity. The participants were arrested after only six months of illegal dumping, but the scheme posed a "threat of continuation into the future" because "the illegal acts were the enterprise's regular way of doing business." 661 A.2d at 273. Only a criminal investigation and months of surveillance and wiretapping by state officials prevented the bribery and dumping from continuing indefinitely.

Unlike the scheme at issue in *Ball,* the scheme alleged here had an internal check that eliminated the threat of continued racketeering activity. Because plaintiff's New Jersey RICO claims are based on a single set of transactions that occurred over less than three months and posed no threat of future racketeering activity, plaintiff's New Jersey RICO claims also must be dismissed.

### E. *False Designation of Origin*

██ Defendants seek to dismiss plaintiff's trademark infringement and unfair competition claims on the ground that defendants have not falsely represented the source or origin of the cars they have sold. Defendants state that Carriage House and Carriage House of Greenwich have sold only genuine Rolls–Royce and Bentley automobiles, and plaintiff does not claim otherwise. However, that does not preclude an action for unauthorized use of the Rolls Royce and Bentley trademarks, or an action for unfair competition based on false statements to the public as to Carriage House's status as an authorized dealer. *See American Honda Motor Co. v. Two Wheel Corp.,* 918 F.2d 1060, 1062–64 (2d Cir.1990). Accordingly, the motion to dismiss is denied as to the trademark infringement and unfair competition claims.

### F. *Fraudulent Conveyance Claim*

Defendants move for summary judgment on plaintiff's fraudulent conveyance claim.

Defendants claim that all of Carriage House's assets were used to satisfy valid antecedent debts, and argue that this vitiates any fraudulent conveyance claims as a matter of law. Defendants have submitted evidence demonstrating that Carriage House became indebted to National Westminster Bank in 1989, long before the disputed transactions involving the 13 cars, and that Carriage House's assets were used to satisfy that indebtedness. (Nicyper Aff. Exs. A–N)

■ Defendants may be correct insofar as the fraudulent conveyance claim is based on N.Y.Debt. & Cred.Law § 273 (McKinney 1990), which provides that "[e]very conveyance made … by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to actual intent if the conveyance is made … without a fair consideration." Defendants' submissions tend to establish that the satisfaction of Carriage House's antecedent debt to National Westminster Bank constitutes valid consideration for Carriage House's asset transfers. However, under N.Y.Debt. & Cred.Law § 276 (McKinney 1990), "[e]very conveyance made … with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." A conveyance may be fraudulent under § 276 even if it is not fraudulent under § 273.

Whether a conveyance is fraudulent under § 276 depends on the intent of the party conveying the assets. The Second Circuit has cautioned that Rule 56 "would be rendered sterile … if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.) (affirming summary judgment in an employment discrimination case), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). However, defendants here moved for summary judgment long before the completion of discovery. Defendants rely on the theory that a claim under § 273 will be barred as a matter of law if Carriage House's outstanding debt to National Westminster Bank is valid. As to a claim under § 276, defendants' motion is premature because defendants' limited submissions do not squarely address the issue of intent, and because plaintiff should have the benefit of at least some discovery before this issue is resolved on the merits. *See* Fed.R.Civ.P. 56(f) ("Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment").

Defendants argue that all facts in its statement under Local Rule 3(g) must be deemed admitted because plaintiff failed to submit a responsive Rule 3(g) statement. However, defendants' Rule 3(g) statement makes no claims as to defendants' intent to defraud creditors. Thus, even if the court were to find procedural default and deem defendants' assertions of fact admitted, that would not bar a fraudulent conveyance claim under § 276.

## IV.

Only two federal claims remain in this action, and they arise from defendants' alleged false advertising and unauthorized use of Rolls–Royce and Bentley trademarks. There is some doubt as to whether jurisdiction for the state law claims properly could be premised on diversity of citizenship. Plaintiff is a corporation that maintains its principal place of business in New Jersey. Defendant partnership Cole, Roberts has an office in Fort Lee, New Jersey. *See* Nicyper Aff. Ex. H. Unincorporated associations are citizens for diversity purposes of every state in which any partner resides. *Carden v. Arkoma Assoc.,* 494 U.S. 185, 195–96, 110 S.Ct. 1015, 1021–22, 108 L.Ed.2d 157 (1990). If any Cole, Roberts partner resides in New Jersey, there is no complete diversity here as is required under 28 U.S.C. § 1332.

■ If there is no diversity, subject matter jurisdiction for the state law claims would have to be premised on principles of supplemental jurisdiction as codified in 28 U.S.C. § 1367 (1994). Supplemental jurisdiction is appropriate when the state claims arise out of the same "nucleus of operative facts" as the jurisdictionally sufficient federal claims.

*People by Abrams v. Terry,* 45 F.3d 17, 23 n. 7 (2d Cir.1995). It is not clear whether that is true of the two sets of claims here. The federal claims involve false advertising and unauthorized use of trademarks by Carriage House of Greenwich; the state claims (other than the state unfair competition and trademark claims) arise from Carriage House's alleged failure to pay for cars under a sales contract.

The parties will be asked to address both of these issues at a forthcoming conference.

\*     \*     \*

For the reasons set forth above, defendants' motion to dismiss is granted as to the first, second, third, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth, and fifteenth claims for relief in plaintiff's complaint. The motion otherwise is denied.

SO ORDERED.