# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

JOSEPH J. DUFFY,

　　　　　　*Plaintiff-Appellee,*

v.

VISION HARDWARE GROUP,
INCORPORATED; ACORN PRODUCTS,
INCORPORATED; UNION TOOLS,
INCORPORATED,

　　　　　　*Defendant-Appellant.*

No. 01-1281

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, Chief District Judge.
(CA-99-3576-JFM)

Argued: September 27, 2001

Decided: October 26, 2001

Before WILKINSON, Chief Judge, and LUTTIG and
MICHAEL, Circuit Judges.

Vacated and remanded by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** M. Bradley Hallwig, ANDERSON, COE & KING,
L.L.P., Baltimore, Maryland, for Appellant. William James Murphy,
MURPHY & SHAFFER, Baltimore, Maryland, for Appellees.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

## OPINION

PER CURIAM:

Joseph J. Duffy filed this breach of contract action against his former employer, Vision Hardware Group, Inc. (Vision), over Vision's refusal to pay him a bonus from the sale of the assets of one of Vision's wholly owned subsidiaries, VSI Fasteners, Inc. (VSI). The district court granted summary judgment to Vision, holding that the plain language of the contract prevented the bonus clause from being triggered. Because we conclude that the contract is ambiguous, we vacate the judgment and remand for further proceedings.

I.

Vision, now known as Acorn Products, Inc., is a holding company whose operating (and wholly owned) subsidiaries manufacture and market non-powered lawn and garden tools. VSI was one of Vision's subsidiaries. In 1991 Vision hired Duffy to be, among other things, its chief executive officer and the chairman of the board of its operating subsidiaries. In 1993 Vision entered into an employment contract with Duffy that provided him a bonus "if and when the Company sells all or substantially all of the outstanding stock or of the assets of VSI" if the sale "results in the Company receiving consideration in excess of Eight Million Dollars." The first paragraph of the contract refers to Vision as "the 'Company.'"

On August 1, 1996, Duffy and Vision entered into a written resignation agreement, but Duffy remained eligible for the bonus if VSI's assets or stock were sold before December 31, 1997. In December 1996 VSI sold substantially all of its assets to Newell Operating Company (Newell), an unrelated entity. Newell paid $6.9 million in cash and agreed to assume certain of VSI's liabilities, totaling about $2.3 million. Vision received $6.9 million in cash as a result of the sale. On February 2, 1998, Duffy demanded payment of the bonus on the

theory that Newell's assumption of VSI's liabilities was part of the consideration received in the sale, bringing the total consideration to $9.2 million. Vision refused to pay the bonus, arguing that it received $6.9 million for the net assets of VSI.

Duffy sued Vision under the contract, and the district court granted summary judgment to Vision. The court concluded that the term "Company" in the contract refers to Vision, and not to VSI. This means, according to the court, that when the contract speaks of "the Company receiving consideration," it refers solely to Vision. Consideration received by VSI but not by Vision did not count toward the $8 million needed to trigger the bonus clause, according to the district court. The court reasoned that because Vision was not independently liable for VSI's debts, Vision did not receive the benefit of Newell's assumption of those debts. Accordingly, the court held that Vision had received only $6.9 million in consideration from the VSI sale, and the bonus clause was not triggered. Duffy appeals.

## II.

Duffy argues that the contract language is ambiguous. The bonus is triggered "if and when the Company sells all or substantially all of the outstanding stock or of the assets of VSI." Duffy points out that while Vision owned all of VSI's stock, VSI, not Vision, owned VSI's assets. Strictly speaking, Vision could not sell VSI's assets because it did not own them. If the term "Company" only refers to Vision, the language that triggers the bonus — "when the Company sells . . . the assets of VSI" — would be rendered meaningless because Vision could not sell assets it did not own. Duffy argues that the only way to give this sale of assets clause meaning is to interpret the term "Company" to include the Company acting through VSI. If the term "Company" encompasses this broader meaning, the next phrase, "the Company receiv[es] consideration," would likewise encompass not only the Company receiving consideration directly, but VSI receiving consideration on behalf of the Company (Vision). Under this interpretation, consideration received by VSI for the sale of its assets (in a sale prompted by the Company) constitutes consideration received by the Company. Thus, under Duffy's theory the consideration received by Vision in this case includes all consideration received by VSI on

Vision's behalf, namely, both the $6.9 million in cash and the $2.3 million in assumed debt, for a total of $9.2 million.

We agree with Duffy that the contract is ambiguous. Even so, we believe that Duffy's focus on the term "Company" is misplaced. The contract opens by stating that it is "by and between VISION HARDWARE GROUP, INC. . . . (the 'Company'), and JOSEPH J. DUFFY . . . (the 'Executive')." The parenthetical following "Vision Hardware Group, Inc." indicates that the term "Company" as used in the rest of the contract refers to Vision. Indeed, throughout the contract the term "Company" refers to Vision, not to Vision and/or VSI. In the bonus clause itself, VSI Fasteners, Inc. is given its own separate parenthetical shorthand, "VSI." Thus, we conclude that the contract clearly indicates that the term "Company" refers only to Vision.

We need not force ambiguity into an otherwise clear and defined term because the contract's ambiguity is apparent without altering the meaning of the term "Company." The contract states that the bonus clause may be triggered "if and when the Company sells all . . . of the . . . stock or of the assets of VSI." While the Company (Vision) technically cannot sell VSI's assets, it can, and in fact did, cause those assets to be sold. Vision argues that instead of changing the meaning of the term "Company," the term "sells" should be read to mean sells or causes to be sold. Vision's argument thus reveals that the term "sells" is ambiguous.

Whatever the ambiguity of the term "sells" in "the Company sells . . . the assets of VSI," the bonus clause also requires that the "VSI Sale results in the Company receiving consideration in excess of [$8 million]." Because "Company" refers only to Vision, Vision argues that Duffy must show that both the $6.9 million in cash and the $2.3 million in debt assumption were consideration received by Vision.

The phrase "the Company sells . . . the assets of VSI" and the phrase "the Company receiv[es] consideration [from the sale]" are independent predicates for the bonus, but the two phrases are also parallel. The contract contemplates the following as a trigger for the bonus clause: (a) Vision "sells" VSI's assets and (b) Vision "receiv[es] consideration" from the sale. Just as Vision cannot technically sell VSI's assets, neither can it technically receive consideration from

a sale to which it is not a party. Thus, an ambiguity is present in the term "receives," just as it is in the term "sells." Vision can only sell VSI's assets indirectly by prompting VSI to sell its assets on Vision's behalf; likewise, Vision can only receive consideration from the sale indirectly by prompting VSI to receive the consideration on Vision's behalf.

If consideration "received" by Vision sometimes includes consideration received by VSI, then Newell's assumption of VSI's debt, even if only a direct benefit to VSI, could still arguably constitute consideration "received" by Vision. We cannot determine from the language of the contract precisely when and how consideration from a VSI asset sale would constitute consideration received by Vision.

Duffy argues that Newell's assumption of VSI's debt should be included in the consideration received by Vision because Vision received the benefit of this arrangement. Duffy concedes that Vision was not independently liable on the debt, but he argues that had Newell not assumed the debt, Vision would have been guilty of asset stripping and held liable in an action to pierce the corporate veil. Accordingly, Duffy argues, Vision received the benefit of the assumption of debt.

Both parties agree that the contract is governed by New York law under the choice of law provision. Although New York law does not lightly disregard corporate formalities, it permits veil piercing in certain circumstances. Under New York law piercing the corporate veil in a parent-subsidiary situation requires a showing: (1) that the parent exercised complete domination over the subsidiary with respect to the transaction attacked and (2) that the domination was exercised to commit a fraud or wrong against the creditor. *See Anderson St. Realty Corp. v. RHMB New Rochelle Leasing Corp.*, 663 N.Y.S.2d 279 (N.Y. App. Div. 1997); *Rolls-Royce Motor Cars, Inc. v. Schudroff*, 929 F.Supp. 117, 122 (S.D.N.Y. 1996).

If Vision, with the express purpose of defrauding VSI's creditors, had intentionally caused VSI to sell its assets while retaining its liabilities, it seems clear that Vision could have been held liable for VSI's debts. *See id.* We can imagine other scenarios, however, where Vision might not have been held liable for VSI's debts, for instance, if the

creditors were unable to prove sufficient control and domination by Vision or were unable to prove a fraud or wrong. *See Ansonia Assocs. Ltd. v. Quik Park Ansonia Garage Corp.*, 686 N.Y.S.2d 418 (N.Y. App. Div. 1999); *Lou Atkins Castings, Inc. v. M. Fabrikant & Sons, Inc.*, 628 N.Y.S.2d 98 (N.Y. App. Div. 1995). Some of the facts in this case would appear to cut against any attempt to pierce the corporate veil. For example, Duffy has not alleged that Vision and VSI disregarded corporate formalities, commingled funds, or had exactly the same office space and employees. *See United States v. Funds Held in Name or for Benefit of Wetterer*, 899 F.Supp. 1013, 1020 (E.D.N.Y. 1995) (listing factors to be considered for veil piercing).

Because Newell did in fact assume VSI's debts, all of these scenarios remain hypothetical. Our point is not to speculate as to what particular set of facts might have given rise to a successful action to pierce the corporate veil, but rather to note that a veil piercing case is difficult to prove under New York law. To convince us that the assumption of VSI's debt necessarily conferred a benefit on Vision, regardless of the resolution of the contract's ambiguity, Duffy would have to show that in all of these possible scenarios, Vision ultimately would have been held liable for VSI's debts. Given the hypothetical nature of Duffy's argument and the stringent requirements of New York law regarding veil piercing, Duffy has not made such a showing.

Nevertheless, the parties clearly intended that consideration received by VSI from a sale of its assets would, in some instances, constitute consideration received by Vision. Thus, even discounting Duffy's veil piercing argument, it remains unclear to this point whether Newell's assumption of VSI's debt counts as part of the consideration received by Vision from the VSI asset sale.

Vision argues that assumption of debt was not intended to count as part of consideration received under any circumstances. If the parties had intended for debt assumption to count, they would have said so specifically, according to Vision. Vision points to other employment contracts between VSI and its executives that also contain a bonus clause triggered by the sale of VSI assets. These contracts explicitly provide that the bonus is triggered and calculated on the basis of "aggregate consideration," which "shall include all obligations of [VSI]

assumed by a purchaser in a Transaction." According to Vision, these contracts show that had Duffy and Vision intended for consideration to include debt assumed, they would have said so explicitly. The problem here could have been avoided had the parties used more specific language. But just as Vision and Duffy could have clearly explained that consideration *included* debt assumed, they also could have clearly explained that consideration *excluded* debt assumed. The fact that the parties could have been more explicit may not, on its own, support either side. Of course, if Vision can show that the parties actually considered and rejected such "aggregate consideration" language in this case, this would support its argument that consideration does not include debt assumed. As the record stands at this point, the contract does not clearly indicate either inclusion or exclusion of debt assumed, so it remains ambiguous.

For the foregoing reasons, we hold that the contract is ambiguous because it does not clearly indicate when and how consideration received by VSI in a VSI asset sale constitutes consideration received by Vision. Additionally, the contract is silent as to whether consideration received from a VSI asset sale ever includes debt assumed. The resolution of these issues depends on evidence external to the contract. Accordingly, we vacate the award of summary judgment and remand to the district court for further proceedings on the meaning of the bonus clause.

*VACATED AND REMANDED*