OPINION OF THE COURT
 

 Simons, J.
 

 Plaintiff Landoil Resources Corporation, a Philippine construction company, instituted this action against defendants Alexander & Alexander Services, Inc.,
 
 et al.
 
 (Alexander), a group of United States corporations engaged in the insurance
 
 *31
 
 brokerage business. It sought to recover damages allegedly sustained as a result of defendants’ wrongful acts in acquiring two policies of political risk insurance to cover plaintiff's foreign projects. Alexander had secured the insurance from Lloyd’s of London. Accordingly, it asserted third-party claims for indemnification and contribution against Lloyd’s Syndicate 317, a group of insurance underwriters who conduct their underwriting business at Lloyd’s.
 

 The matter comes to us from the United States Court of Appeals for the Second Circuit, which certified the question of whether Syndicate 317 is "doing business” in New York and therefore subject to personal jurisdiction under CPLR 301
 
 (see,
 
 22 NYCRR 500.17). We accepted the certified question and now answer it in the negative.
 

 I
 

 Before addressing the question, it is important to understand how Lloyd’s of London conducts its business.
 

 The Corporation of Lloyd’s is a nonprofit corporation created by a Special Act of Parliament in 1871. It does no underwriting, but instead provides services to members who perform underwriting in their individual capacities. The individual members transact their business in groups called syndicates, managed by agents who in turn employ an active underwriter to handle the business for the syndicate. The managing agent keeps the syndicate’s books while the active underwriter accepts or rejects the risks submitted for underwriting, collects premiums, pays losses and disburses all funds. All the syndicates conduct their business at the market place known as Lloyd’s of London located at One Lime Street, London, England.
 

 Lloyd’s policies can only be obtained by registered Lloyd’s brokers who have been appointed either by the prospective insured or by the insured’s non-Lloyd’s broker. In placing policies, a registered Lloyd’s broker prepares a "slip” which states the details of the insurance required and then offers the risk to the active underwriters. Any underwriter who wishes to underwrite all or a portion of the risk indicates this on the slip. Once the entire risk has been subscribed, the Lloyd’s broker informs its principal that the insurance has been effected. A policy is prepared by Lloyd’s Policy Signing Office, a department of the Corporation of Lloyd’s, and the transaction is consummated.
 

 
 *32
 
 Landoil’s policies were obtained in this manner. In 1982 and 1983 it requested Alexander to acquire political risk insurance policies covering its operations in the Middle East and Africa. Since Alexander was not a registered Lloyd’s broker, the policies had to be negotiated in London between an appointed Lloyd’s broker and certain Lloyd’s underwriters. Alexander secured the insurance from a group of Lloyd’s underwriters, including Syndicate 317.
 

 Subsequently, disputes arose between Landoil and the various underwriters, including Syndicate 317, over the coverage of certain losses. The claims were settled following arbitration proceedings in London to which Alexander was not a party. Landoil then instituted this action against Alexander in the United States District Court to recover the balance of its loss. Alexander filed a third-party complaint for indemnification and contribution against Syndicate 317 and other Lloyd’s underwriters alleged to have subscribed to Landoil’s policies and Syndicate 317 responded by filing the motion to dismiss the third-party complaint for lack of personal jurisdiction.
 
 [1]
 
 The District Court denied the motion to dismiss, holding that Syndicate 317 was "doing business” in New York within the meaning of CPLR 301
 
 (Landoil Resources Corp. v Alexander & Alexander,
 
 720 F Supp 26).
 

 The court rested its decision on the existence of a fund held in trust at Citibank in New York City by the Corporation of Lloyd’s. The fund, known as the American Trust Fund (Fund), was originally established in 1940 to provide security to United States policyholders during World War II, when England was under siege by Germany. It consists of United States dollar premiums collected worldwide by Lloyd’s brokers and subsequently transferred through Lloyd’s accounting system in London to Citibank in New York. The Fund is used to pay American claims underwritten by Lloyd’s. It also serves as security for New York insureds pursuant to New York Insurance Department regulations which provide that a New York broker or insurance company cannot place New York risks with an unauthorized alien or foreign insurer unless it has
 
 *33
 
 ascertained that such insurer maintains a trust fund at a New York bank, in an amount specified by regulation, as security for the insured
 
 (see,
 
 11 NYCRR 27.5 [a] [1] [ii];
 
 see also,
 
 125.4 [c]). Thus, the Fund enables New York brokers and insurance companies to submit risks to Lloyd’s underwriting syndicates which are not authorized to write insurance in New York. The Lloyd’s underwriters do not directly deposit or withdraw any moneys from the Fund, but a portion of United States dollar premiums attributable to risks underwritten by groups such as Syndicate 317, including some derived from New York insureds and risks, are part of its assets. The Fund is administered by the Finance & Market Services Group (FMSG), one of Lloyd’s administrative departments and, as of December 31, 1988, it had $9.4 billion dollars on deposit at Citibank.
 

 From these facts, the District Court concluded that FMSG "is performing a service in New York” on behalf of Syndicate 317, by administering — from London — the Lloyd’s American Trust Fund. Inasmuch as the assets of the Fund were in the billions of dollars, the court inferred that the underwriting was substantial and that these activities constituted "doing business” in this State. The court did not rest its ruling on activities of Syndicate 317 in New York, observing that "in the traditional sense of the phrase, they do not themselves 'do business’ anywhere except in London.”
 
 (Landoil Resources Corp. v Alexander & Alexander,
 
 720 F Supp 26, 27,
 
 supra.)
 
 Syndicate 317 appealed to the Second Circuit Court of Appeals and that court certified the question to us. We conclude that Syndicate 317 is not subject to in personam jurisdiction in New York State.
 

 II
 

 A foreign corporation is amenable to suit in New York courts under CPLR 301 if it has engaged in such a continuous and systematic course of "doing business” here that a finding of its "presence” in this jurisdiction is warranted
 
 (Laufer v Ostrow,
 
 55 NY2d 305, 309-310;
 
 Frummer v Hilton Hotels Intl.,
 
 19 NY2d 533, 536;
 
 Simonson v International Bank,
 
 14 NY2d 281, 285;
 
 accord, Delagi v Volkswagenwerk AG,
 
 29 NY2d 426, 430-431). The test for "doing business” is a "simple [and] pragmatic one,” which varies in its application depending on the particular facts of each case
 
 (see, Bryant v Finnish Natl. Airline,
 
 15 NY2d 426, 432;
 
 see generally,
 
 Siegel, NY Prac §§ 82, 83). The court must be able to say from the facts that
 
 *34
 
 the corporation is "present” in the State "not occasionally or casually, but with a fair measure of permanence and continuity”
 
 (Tauza v Susquehanna Coal Co.,
 
 220 NY 259, 267;
 
 see also, Laufer v Ostrow,
 
 55 NY2d 305, 310,
 
 supra).
 
 That test is not satisfied by the evidence in the record before us.
 

 Alexander’s submission focuses on three general areas.
 

 A
 

 First, Alexander contends that Syndicate 317 is doing business in New York because it underwrites policies for New York insureds and risks. Such activity standing alone, however, will not support jurisdiction. In
 
 Delagi v Volkswagenwerk AG
 
 (29 NY2d 426, 433,
 
 supra),
 
 we held that "mere sales of a manufacturer’s product in New York, however substantial, have never made the foreign corporation manufacturer amenable to suit in this jurisdiction.”
 
 Delagi
 
 involved a German automobile manufacturing corporation which sold its vehicles to a New Jersey importing corporation, a wholly owned subsidiary, which in turn sold them to a corporate wholesale distributor in New York owned by American investors. We concluded that the manufacturer, which was not qualified to do business in this State and did not have an office or place of business here, was not subject to jurisdiction because it had not engaged in a systematic and regular course of business in New York
 
 (Delagi v Volkswagenwerk AG,
 
 29 NY2d 426,
 
 supra).
 

 Similarly, the sale of insurance policies in New York, which are underwritten by a group of unauthorized foreign underwriters, does not, without more, support a finding that the underwriters are engaging in a systematic and regular course of business in New York
 
 (cf., Bryant v Finnish Natl. Airline,
 
 15 NY2d 267, 270,
 
 supra
 
 [office, staff and bank account in New York constituted doing business];
 
 Tauza v Susquehanna Coal Co.,
 
 220 NY 259,
 
 supra
 
 [office and direct and continuous sales and shipment of goods into New York constituted doing business]). Syndicate 317 does not have an office in New York, it does not solicit business in New York, it has no real or personal property in New York and it does not maintain a bank account in New York. Rather, it conducts its business in London and considers risks brought to it there by registered Lloyd’s brokers. A New York broker may seek to place insurance with Syndicate 317, through a Lloyd’s broker,
 
 *35
 
 but Syndicate 317 does not directly or purposefully solicit, sell or promote its underwriting activity in New York.
 

 B
 

 Alexander next contends that Syndicate 317 has sufficient interest in the Lloyd’s American Trust Fund to warrant a finding of its "presence” in New York. It notes that a portion of United States dollar premiums, including income derived from the underwriting of New York risks by Syndicate 317, is deposited in the trust fund and that without it or a similar type of fund, New York brokers and insurance companies could not conduct business with the Syndicate. Syndicate 317’s indirect interest in that Fund does not provide a basis for CPLR 301 jurisdiction, however.
 
 [2]
 

 Syndicate 317 does not "maintain an account” at Citibank in the usual sense. Funds cannot be withdrawn from or deposited into the account by Syndicate 317 and it is not administered by Syndicate 317 or the underwriters, but rather by FMSG, an administrative branch of the Corporation of Lloyd’s. But even if it is assumed that Syndicate 317 does "maintain” the account, because a portion of the income derived from the underwriting of New York risks by Syndicate 317 is on deposit there, that alone does not establish that Lloyd’s underwriters do business in New York on a continuous and systematic basis
 
 (see, Nemetsky v Banque de Developpement,
 
 48 NY2d 962 [involving a correspondent banking relationship];
 
 see also, Bank of Am. v Whitney Bank,
 
 261 US 171).
 

 Alexander contends that
 
 Nemetsky
 
 and
 
 Whitney
 
 are distin
 
 *36
 
 guishable because the Fund is not used merely to facilitate underwriting of New York risks, but rather is a functional predicate to Syndicate 317 insuring New York customers or risks. It maintains that this added purpose suffices to support a finding that the Syndicate is "doing business” in New York. To establish jurisdiction under CPLR 301, however, the foreign entity must engage in a continuous and systematic course of activity in this State. Syndicate 317’s only connection with the Fund is that some unknown amount of United States dollar premiums attributable to risks underwritten by it are on deposit in the Fund.
 

 Moreover, the Fund is not maintained for the purpose of allowing Syndicate 317 to take advantage of the New York insurance market. It was established in 1940 to provide security for the payment of valid claims made by all United States holders of insurance policies underwritten at Lloyd’s in London. The fact that the Fund now satisfies the requirements of the New York insurance regulations so that New York brokers and insurers can seek coverage from Lloyd’s underwriters through registered Lloyd’s brokers in London is fortuitous. Whether Lloyd’s would, in the absence of such a fund, establish something similar in its place which might support jurisdiction, is entirely speculative. The existence of a New York trust fund established for the benefit of United States holders of Lloyd’s policies cannot serve as a predicate for exercising jurisdiction over the Lloyd’s underwriters pursuant to CPLR 301 merely because it indirectly benefits Syndicate 317.
 

 C
 

 Finally, Alexander maintains that FMSG is an agent of Syndicate 317 and that its activities in administering the New York account are sufficient to confer jurisdiction over Syndicate 317 under the ruling in
 
 Laufer v Ostrow
 
 (55 NY2d 305,
 
 supra)
 
 and other agency cases
 
 (see, e.g., Gelfand v Tanner Motor Tours,
 
 385 F2d 116;
 
 Frummer v Hilton Hotels Intl.,
 
 19 NY2d 533,
 
 supra).
 
 Assuming that FMSG is an agent of Syndicate 317 because of its administrative activities, more than an agency relationship is needed to support in personam jurisdiction. FMSG is not physically present in New York, it does not solicit business for the Lloyd’s underwriters in New York and it performs all of its administrative functions relating to the Fund from London. It cannot be said to be performing acts in New York on a systematic and continuous basis or for the
 
 *37
 
 benefit of Syndicate 317
 
 (cf., Laufer v Ostrow, supra; Frummer v Hilton Hotels Intl., supra).
 

 The plaintiff in this case is a Philippine corporation which was insured by a British insurer for risks in foreign countries. The dispute in the third-party action is between an American broker, not the insured, and the British insurer. Personal jurisdiction in New York between the two must necessarily rest upon the existence of the Citibank account but to hold in favor of Alexander on that basis would subject any foreign insurer to suit in New York merely because of the existence of a security fund, whether the insurer had sold insurance here or not. The facts presented do not support a finding of "doing business” under the New York statute.
 

 Accordingly, the certified question should be answered in the negative.
 

 Chief Judge Wachtler and Judges Kaye, Alexander, Titone, Hancock, Jr., and Bellacosa concur.
 

 Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.17 of the Rules of Practice of the New York State Court of Appeals (22 NYCRR 500.17), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified question answered in the negative.
 

 [1]
 

 . In ruling on the motion, the District Court considered all of the underwriters to be appearing on the motion. Observing that the motion presented a question of first impression, the District Court certified that such question was one "upon which reasonable minds might differ.” (28 USC § 1292 [b]; 1989 Lexis 13826.) On appeal to the Second Circuit, Syndicate 317 conceded that the motion is in effect a test case for the other Lloyd’s underwriters named in the third-party complaint.
 

 [2]
 

 . This is not to say that the Fund can never serve as a predicate for exercising jurisdiction over a Lloyd’s syndicate. The Fund might, in an appropriate case, serve as a predicate for exercising jurisdiction based on quasi in rem or long-arm principles. Contrary to the third-party plaintiffs’ contention, however, this Court’s analysis in
 
 Banco Ambrosiano v Artoc Bank & Trust
 
 (62 NY2d 65), which was based on quasi in rem principles, is not equally applicable to "doing business” cases. In
 
 Banco,
 
 we held that the relationship between the defendant, the litigation and the State was sufficient to make.it fair that defendant be compelled to defend in New York. In distinguishing cases where the maintenance of a bank account in New York was found not to be sufficient to sustain jurisdiction, we stated that the
 
 Banco
 
 case did not involve property coincidentally located within the State’s borders which formed the only relevant link to defendant; rather, defendant’s account with the New York bank was closely related to plaintiff’s claim making quasi in rem jurisdiction proper under the facts of that case. Here, the Trust Fund does not relate in any way to the direct cause of action or to the third-party complaint.