**EED HOLDINGS, Plaintiff,**

v.

**PALMER JOHNSON ACQUISITION CORP. and Andrew J. McKelvey, Defendants.**

**No. 04 Civ. 0505(RWS).**

United States District Court, S.D. New York.

Oct. 20, 2004.

---

Friedman, Wittenstein & Hochman, New York, NY (Stuart I. Friedman, Ivan O. Kline, of counsel), for plaintiff.

Levi Lubarsky & Feigenbaum, New York, NY (Steven B. Feigenbaum, of counsel), for defendants.

## OPINION

SWEET, District Judge.

The defendants Palmer Johnson Acquisition Corp. ("PJAC") and Andrew J. McKelvey ("McKelvey") (collectively the "Defendants") have moved under Fed. R.Civ.P. 12(b)(6) and 9(b) to dismiss the complaint of plaintiff EED Holdings ("EED") against McKelvey and under Rule 12(b)(2), Fed.R.Civ.P., to dismiss the claim against PJAC for lack of jurisdiction, and, alternatively, under 28 U.S.C. § 1404(a) to transfer the claim to the Eastern District of Wisconsin. For the reasons set forth below, the motion to dismiss the claims against McKelvey is granted in part and denied in part. The motion to dismiss PJAC for lack of jurisdiction is denied with leave to move for summary judgment after jurisdictional discovery.

### I. Prior Proceedings

This diversity action was filed on January 22, 2004. On that day, a complaint was filed against defendants McKelvey and PJAC by EED, a Cayman Island corporation whose chief asset is a Cayman Island flag vessel. The above-referenced motions were heard and marked as fully submitted on June 2, 2004.

### II. Facts Alleged In The Complaint

The allegations of the complaint, which are accepted as true for the purpose of these motions, describe the relationship of the parties and the nature of the dispute.

For several decades prior to 2000, Palmer Johnson, Inc. ("PJI") constructed yachts in Wisconsin. (Compl.¶ 7). In 2000, McKelvey formed PJAC, and on September 29, 2000, PJAC acquired 100% of the stock of PJI and two other Palmer Johnson companies (the "PJAC Acquisition"). (Compl.¶ 8). McKelvey has at all times been the sole shareholder and director of PJAC. (Compl.¶ 9).

For some time prior to the PJAC Acquisition, PJI had experienced considerable financial and operating difficulties. (Compl.¶ 8). Following the acquisition, PJI's condition worsened. PJI incurred operating losses in the amounts of approximately $1.7 million during the last three months of 2000, and $8.5 million during 2001. (Compl.¶ 11). In addition, during 2001, PJI was required to recognize a loss of approximately $12.4 million, consisting of 100% of its goodwill, so that PJI's total loss for 2001 was approximately $20.9 million. (Compl.¶ 11).

In the spring of 2001, Marc Goldman ("Goldman"), the sole owner of EED, met with McKelvey at the New York Yacht Club in Manhattan. Goldman, who was considering several yacht construction companies, discussed with McKelvey the type of yacht he wanted. (Compl.¶¶ 13, 14). McKelvey was then aware that PJI was undercapitalized, was facing significant financial difficulties, and would not be able to properly perform under a yacht construction agreement. (Compl.¶ 15). Nonetheless, in order to convince Goldman to contract with PJI, McKelvey spoke at length about the attributes of PJI, and specifically stated that it had the capability and wherewithal to properly construct in a timely manner the yacht Goldman sought. (Compl.¶ 14). McKelvey also assured Goldman that PJI would be building the "greatest boats" and that he was personally "committed to PJI." *Id.* In reliance on these representations, Goldman decided to have EED contract with PJI. (Compl.¶ 16).

EED entered into a Yacht Construction and Sale Agreement (the "Construction Agreement") with PJI on August 3, 2001, pursuant to which PJI agreed to construct and deliver to EED, on or before November 30, 2002, an aluminum alloy motor yacht (the "Yacht") in accordance with specifications and plans for a fixed price of $10,785,000. The Construction Agreement provided that if PJI failed to complete the Yacht on time, it would owe EED liquidated damages of $2,000 per day for each day of delay in delivery of the Yacht, beginning on the thirty-first day following the due date. (Compl.¶ 16).

The Construction Agreement contained a number of warranties by PJI, including a warranty to repair or replace any defects in workmanship and/or materials for a period of thirty-six months following delivery of the Yacht, and warranties with respect to the speed of the Yacht. (Compl.¶ 17). The Construction Agreement further provided for the sale of an existing yacht (the "Interim Vessel") to EED for use while the Yacht was being constructed. (Compl.¶ 18). EED paid $2.2 million to PJI for the Interim Vessel, which was delivered to EED after execution of the Construction Agreement. (Compl.¶ 18). The Construction Agreement provided that EED would return the Interim Vessel for repurchase by PJI when the Yacht was complete or near completion, and EED would thereupon receive a $2.2 million credit to be applied to the last several payments by EED to PJI for the Yacht. (Compl.¶ 18).

In order to further induce EED to contract with PJI, PJAC executed a Parent Guaranty dated August 3, 2001 (the "Guaranty"), pursuant to which PJAC unconditionally and irrevocably guaranteed to EED the performance of, and compliance

with, all obligations, covenants, warranties, and undertakings of PJI in the Construction Agreement. (Compl.¶ 19). The Guaranty provided that PJAC's liability to EED would not be affected as a result of any agreement entered into by EED and PJI, or by the cessation for any reason of the liability of PJI to EED, other than through completion and delivery of the Yacht pursuant to the Construction Agreement. *Id.*

After a number of months, PJI fell behind on its performance. (Compl.¶ 20). By the end of 2002, PJI was in default on various obligations under the Construction Agreement, and by early 2003, it was unable to continue to work on the Yacht without EED making additional payments not owed under the terms of the Construction Agreement. (Compl.¶ 21).

In February 2003, a representative of PJI advised Goldman that PJI would likely soon be in bankruptcy, and suggested that EED agree to immediately accept title to the Yacht, release PJI from further obligations under the Construction Agreement, and then contract with PJI to continue work on the Yacht on a time and material basis. (Compl.¶ 22). To effectuate this, EED assigned all of its rights, title, and interest in and to the Construction Agreement to MG Vessel Construction LLC ("MG Vessel"), a limited liability company owned by Goldman (Compl.¶ 23), and PJI transferred title to the Yacht to MG Vessel in satisfaction of its obligations to MG Vessel under the Construction Agreement. (Compl.¶ 24). Notably, PJAC consented to the assignment, acknowledged and agreed that PJI was in default under the Construction Agreement, and irrevocably agreed that the Guaranty

would remain "in full force and effect." (Compl.¶ 23).

On March 6, 2003, an involuntary petition under the Bankruptcy Code was filed against PJI in the United States Bankruptcy Court for the Eastern District of Wisconsin. (Compl.¶ 25). MG Vessel thereafter contracted with PJI for the completion of the Yacht on a time and material basis, with MG Vessel making certain payments to PJI and other payments directly to third party vendors. (Compl.¶ 26). In late April 2003, the Yacht, although still not completed, was floated at Sturgeon Bay, and brought to a facility in Michigan for further work by PJI. On or about July 1, 2003—approximately six months after the completion date in the Construction Agreement as extended by change orders—MG Vessel took possession of the Yacht from PJI in Michigan, though additional work was still required. (Compl.¶ 27).[1]

Because of PJI's financial condition, it was not able to accept the return of the Interim Vessel and provide a credit to EED or MG Vessel in the amount of $2.2 million as provided in the Construction Agreement. (Compl.¶ 28). Instead, EED was forced to retain possession of the Interim Vessel, and incurred additional expenses in connection therewith after it had the use of the Yacht. *Id.* In December 2003, EED was able to sell the Interim Vessel, but for less than half of the $2.2 million credit that was to have been provided by PJI. (Compl.¶ 29).

The Yacht, as delivered, failed to meet certain specifications and warranties in the Construction Agreement, including some for which the agreement provides liquidated damages. PJI has also not complied with its warranty for the repair of defects,

---

1. MG Vessel subsequently transferred title to the Yacht to EED and assigned to EED its rights under the Guaranty. (Compl.¶ 33).

thereby requiring EED to make further payments to third parties. (Compl.¶ 30). As a result of PJI's numerous breaches, including those related to the Interim Vessel, EED has incurred damages in excess of $2.45 million. (Compl.¶¶ 31, 32).

## III. *Discussion*

Four causes of action have been asserted by EED in the complaint: (1) a breach of guaranty claim against PJAC (Compl.¶¶ 35–39), (2) a claim of piercing the corporate veil and alter ego liability against McKelvey (Compl.¶¶ 40–46), (3) a fraud claim against McKelvey, (Compl.¶¶ 47–50), and (4) a negligent misrepresentation claim against McKelvey (Compl.¶¶ 51–53).

As stated above, defendants PJAC and McKelvey have moved under Fed.R.Civ.P. 12(b)(6) and 9(b) to dismiss EED's complaint against McKelvey and under Fed. R.Civ.P. 12(b)(2) to dismiss the claim against PJAC for lack of jurisdiction, and, alternatively, under 28 U.S.C. § 1404(a) to transfer the claim to the Eastern District of Wisconsin.

### A. *Standard of Review*

A motion to dismiss pursuant to Rule 12 must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). For purposes of a Rule 12 motion, all well pleaded allegations are accepted as true, and all inferences are drawn in favor of the pleader. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993).

### B. *Dismissal Of PJAC For Lack Of Personal Jurisdiction Denied*

Co-defendant PJAC has moved for dismissal of EED's contract claim against it on the grounds that this Court lacks personal jurisdiction over PJAC. In a diversity action, the law of the state in which the district court sits governs personal jurisdiction over a nonresident defendant. Fed.R.Civ.P. 4(k)(1)(A), *United States v. First National City Bank,* 379 U.S. 378, 381–82, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965). Here, EED argues that the defendants are amenable to suit under New York's corporate presence doctrine and under its long arm statute. *See* N.Y. C.P.L.R. §§ 301, 302(a)(1).[2]

### 1. *Corporate Presence Doctrine*

██ Pursuant to caselaw codified by section 301 of New York's Civil Practice Law and Rules ("CPLR"), an unlicensed foreign corporation is subject to the general personal jurisdiction of the courts of New York if such corporation is "doing business" in the state. *See Landoil Resources Corp. v. Alexander & Alexander Servs., Inc.,* 77 N.Y.2d 28, 33, 563 N.Y.S.2d 739, 741, 565 N.E.2d 488, 490 (1990); *accord Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 95 (2d Cir.2000). A defendant corporation is deemed to be "doing business" in New York if it has engaged in "such a continuous and systematic course of [business] here that a finding of its 'presence' in this jurisdiction is warranted[.]" *Landoil,* 77 N.Y.2d at 33, 563 N.Y.S.2d at 741, 565 N.E.2d at 490 (citing *Laufer v. Ostrow,* 55 N.Y.2d 305, 309–310, 449 N.Y.S.2d 456, 458, 434 N.E.2d 692, 694 (1982); *Delagi v. Volkswagenwerk AG,* 29 N.Y.2d 426, 430–31, 328 N.Y.S.2d 653, 655–56, 278 N.E.2d 895, 896 (1972); *Frummer*

**2.** For the reasons discussed below, it is not necessary to consider EED's argument that personal jurisdiction exists because PJAC is merely McKelvey's alter ego.

*v. Hilton Hotels Int'l,* 19 N.Y.2d 533, 536, 281 N.Y.S.2d 41, 43, 227 N.E.2d 851, 853 (1967)).

PJAC argues that it cannot be found to have been "doing business" in New York because it possessed "none of the factors indicative of presence" in New York. *Mareno v. Rowe,* 910 F.2d 1043, 1046 (2d Cir. 1990). That is, PJAC states that it had no offices, employees, banking accounts, or activities in the state. Furthermore, PJAC argues that McKelvey merely resided in New York during the relevant time period, and that such conduct is insufficient, as a matter of law, to support a finding that PJAC was doing business in-state. *See Fremay, Inc. v. Modern Plastic Mach. Corp.,* 15 A.D.2d 235, 241–42, 222 N.Y.S.2d 694, 700–01 (1st Dept.1961) (holding that for the purpose of determining whether defendant corporation was doing business in New York, it was of "no particular moment" that (1) the defendant's corporate officers resided in New York and (2) that such officers used their personal offices for incidental transactions relating to their status as officers/-investors.)

EED argues that it has made a *prima facie* showing that PJAC was "doing business" in New York by its allegations that McKelvey, PJAC's sole shareholder and director, lives and works in New York. EED argues that under applicable corporate law, Del. CODE ANN. tit. 8 § 141(a) (2004), the responsibility for managing PJAC's affairs rests with its board of directors. Since McKelvey was PJAC's only director, EED argues, PJAC was necessarily managed in New York, thereby subjecting it to New York's corporate presence doctrine.

## 2. *Long Arm Jurisdiction*

■ CPLR section 302(a)(1) gives the courts of New York personal jurisdiction over a cause of action involving a nondomiciliary defendant who, in person or through an agent, "transacts any business within the state[,]" provided that the cause of action arises from such transaction. For the purpose of determining whether a given foreign corporation defendant transacted business in New York, "what counts is not the quantity of contacts with New York, but rather the nature and quality of the contacts." *Lawrence Wisser & Co., Inc. v. Slender You, Inc.,* 695 F.Supp. 1560, 1563 (S.D.N.Y.1988). This inquiry focuses on whether the defendant " 'engaged in some purposeful activity [here] . . . in connection with the matter in suit.' " *Parke–Bernet Galleries, Inc. v. Franklyn,* 26 N.Y.2d 13, 16, 308 N.Y.S.2d 337, 340, 256 N.E.2d 506, 507 (1970) (quoting *Longines–Wittnauer Watch Co. v. Barnes & Reinecke,* 15 N.Y.2d 443, 457, 261 N.Y.S.2d 8, 18–19, 209 N.E.2d 68, 75 (1965)).

With respect to long arm jurisdiction, EED argues that the Court must conclude, for the purposes of this motion, that PJAC transacted business in New York because (1) McKelvey, who is alleged to live and work in New York, approved the Guaranty and (2) the initial discussions between McKelvey and Goldman concerning the Construction Agreement occurred in-state at the New York Yacht Club. In opposition, PJAC argues that EED has failed to allege that PJAC transacted any business related to the Guaranty in New York. In particular, PJAC states that McKelvey and Goldman did not discuss the possibility of a PJAC guaranty during the course of their 2001 meeting at the New York Yacht Club.

## 3. *Jurisdictional Discovery Is Warranted*

■ It is well established in this circuit that prior to discovery, plaintiff can avoid Rule 12(b)(2) dismissal by making a *prima facie* showing that personal jurisdiction ex-

ists. *Jazini by Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir.1998) (quoting *Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.1990)); *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir.1985).

■ Based on the properly-pleaded allegations contained in the complaint, which this Court must accept as true for the purpose of this motion, EED appears to have made a *prima facie* showing that PJAC either (1) was doing business in New York pursuant to CPLR section 301 or (2) transacted business in New York pursuant to CPLR section 302(a)(1).

In light of the foregoing, it is appropriate to deny PJAC's 12(b)(2) motion and to grant EED's request for jurisdictional discovery. Once jurisdictional discovery is completed, PJAC may choose to move for summary judgment, pursuant to Fed. R.Civ.P. 56, for lack of personal jurisdiction.

## C. The Veil Piercing/Alter Ego Claim Is Dismissed

The New York Court of Appeals[3] has described the doctrine of piercing the corporate veil:

> The doctrine . . . is typically employed by a [claimant] seeking to go behind the corporate existence in order to circumvent the limited liability of the owners and to hold them liable for some underlying corporate obligation [citations omitted]. The concept is equitable in nature and assumes the corporation itself is liable for the obligation sought to be imposed [citation omitted]. Thus, an attempt of a [claimant] to pierce the

corporate veil does not constitute a cause of action independent of that against the corporation; rather it is an assertion of facts and circumstances which will persuade the court to impose the corporate obligation on its owners [citation omitted].

*Matter of Morris v. New York State Dep't of Taxation and Fin.*, 82 N.Y.2d 135, 140–41, 603 N.Y.S.2d 807, 810, 623 N.E.2d 1157, 1160 (1993). The Second Circuit has stated that veil piercing is a narrow exception to the doctrine of limited liability for corporate entities, and that courts should permit veil-piercing only under "extraordinary circumstances." *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir.1996).

■ Under New York law, a party seeking to pierce the corporate veil must generally show that: "(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." *Matter of Morris*, 82 N.Y.2d at 141, 603 N.Y.S.2d at 810–11, 623 N.E.2d at 1160–61 (1993). The New York Court of Appeals has held that both of these elements must be established in order to justify application of the veil-piercing doctrine. *See TNS Holdings, Inc. v. MKI Secs. Corp.*, 92 N.Y.2d 335, 339, 680 N.Y.S.2d 891, 893, 703 N.E.2d 749, 751, 703 N.E.2d 749, 751 (1998) ("Evidence of domination alone does not suffice without an additional showing that it led to inequity, fraud or malfeasance.") (citing *Matter of Morris v. N.Y. State Dept. of Taxation*, 82 N.Y.2d 135 at

---

**3.** Although the law of the state of incorporation, here Delaware, ordinarily governs whether to disregard the corporate form, New York and Delaware law on that issue are substantially similar. *See Harrison v. NBD Inc.*, 990 F.Supp. 179, 184 (E.D.N.Y.1998)

(stating that a plaintiff asserting a veil-piercing claim under Delaware law must show "that the controlling corporation wholly ignored separate status of controlled corporation and so dominated and controlled its affairs that separate existence was a sham.")

140–41, 603 N.Y.S.2d 807 at 810, 623 N.E.2d at 1160).

■ In this district, veil-piercing claims are subject to the pleading requirements imposed by Fed.R.Civ.P. 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." *See Rolls–Royce Motor Cars, Inc. v. Schudroff, BBS,* 929 F.Supp. 117, 122 (S.D.N.Y.1996); *see also In re Currency Conversion Fee Antitrust Litig.,* 265 F.Supp.2d 385, 426 (S.D.N.Y., 2003) ("[W]here ... veil-piercing claims are not based on allegations of fraud, the liberal 'notice pleading' standard of Rule 8(a) applies.") To avoid dismissal, a party seeking application of the doctrine must come forward with factual allegations as to both elements of the veil-piercing claim. *See, e.g., JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs.,* 295 F.Supp.2d 366, 379 (S.D.N.Y.2003) (stating that both elements of a veil-piercing claim must be alleged); *Zinaman v. USTS New York, Inc.,* 798 F.Supp. 128, 131 (S.D.N.Y. 1992) (same). Furthermore, it is well established that "purely conclusory allegations cannot suffice to state a claim based on veil-piercing or alter-ego liability, even under [Rule 8(a)'s] liberal notice pleading standard." *In re Currency Conversion Fee Antitrust Litig.,* 265 F.Supp.2d at 426; *see also De Jesus v. Sears, Roebuck & Co.,* 87 F.3d 65, 70 (2d Cir.1996) (dismissing alter-ego claim where complaint was "devoid of any specific facts or circumstances supporting" plaintiff's conclusory allegations

concerning defendant's domination of its subsidiary); *Zinaman,* 798 F.Supp. at 132 (S.D.N.Y.1992) (dismissing alter ego claim on the grounds that "[c]omplaint [was] conclusory at best and fail[ed] to plead to requisite elements of an alter ego theory").[4]

■ EED has adequately alleged the first element of a veil-piercing claim—*i.e.,* that McKelvey dominated PJAC. The complaint contains factual allegations concerning how McKelvey dominated PJAC (*see* Compl. ¶¶ 9, 42, 44), how he "used PJAC to further his own interest, at the expense of creditors of PJAC and its subsidiaries" (*id.* at ¶¶ 9, 42, 43), and how he "directed PJI to conceal information from EED as to its operating difficulties and delays." (*id.* ¶ 20).

However, EED has failed to properly allege the second element of the veil-piercing claim—*i.e.,* that McKelvey used his domination over PJAC to commit a fraud or wrong against EED that which resulted in plaintiff's injury. To satisfy this element, EED alleges only that McKelvey "knowingly undercapitalized [PJAC and PJI] to avoid obligations that would arise from their operations, including the obligations to EED under the Construction Agreement and the Guaranty," (Compl.¶ 41). However, EED fails to provide any factual allegations as to why the undercapitalization of PJAC, which undertook the Guaranty, defrauded or otherwise

4. It should be noted that in its motion papers, EED appears to suggest, via citation to two cases from this district, that conclusory allegations as to the elements of veil-piercing may be sufficient to avoid dismissal for failure to state a claim. However, in both of these cases, the court's refusal to dismiss a veil-piercing claim was based on its determination that sufficient facts, and not mere conclusions, had been alleged. *See Rolls–Royce Motor Cars Inc. v. Schudroff,* 929 F.Supp. 117, 122 (S.D.N.Y.1996) ("Plaintiff has alleged the *fact* of complete domination and the use of that domination to commit a wrong against creditors.") (emphasis added); *Citicorp Int'l Trading Co. v. Western Oil & Refining Co.,* 771 F.Supp. 600, 608 (S.D.N.Y.1991) (holding that party seeking veil-piercing had set forth "a short and concise statement of *facts* which are necessary to support their claim to pierce the veil") (emphasis added).

harmed EED. EED has similarly failed to allege that either McKelvey or PJAC had anything to do with the PJI's construction of EED's Yacht. According to the complaint, this yacht construction, the subject of the Guaranty, was done by others at PJI's facilities in Wisconsin. Without such allegations concerning the undercapitalization of PJAC, EED's veil piercing/alter ego claim fails to establish that McKelvey's domination of PJAC was the means by which wrong was done to EED. *See, e.g., TNS Holdings,* 92 N.Y.2d at 340, 680 N.Y.S.2d at 893, 703 N.E.2d at 751 (dismissing alter ego claim for lack of "showing that through its domination [defendant] misused the corporate form for its personal ends so as to commit a fraud or wrongdoing or avoid any of its obligations." [citation omitted] ).

None of the decisions cited by plaintiff—all of which support the proposition that both elements of a veil-piercing claim must be properly alleged in order to defeat a 12(b)(6) motion—warrant a different result.[5]

## D. *The Fraud Claim Against McKelvey Survives*

The New York Court of Appeals has stated that:

> [i]n an action to recover damages for fraud, the plaintiff must prove a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely

upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury[.]

*Lama Holding Co. v. Smith Barney, Inc.,* 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 80, 668 N.E.2d 1370, 1373 (1996) (citing *New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 318, 639 N.Y.S.2d 283, 289, 662 N.E.2d 763, 769 (1995); *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.,* 4 N.Y.2d 403, 406–07, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833, 835 (1958)); *see also* 60A William H. Danne, Jr., *N.Y. Jur.* § 14 (2d ed. 2003) (*"N.Y.Jur."*) (The elements of the fraud cause of action are "representation of a material fact, falsity, scienter, reliance, and injury or damage.").

McKelvey has moved for dismissal of EED's fraud claim on the following grounds: (1) that the allegedly fraudulent statements are non-actionable "puffery," (2) that the fraud claim violates the economic loss rule, (3) that the fraud claim is indistinguishable from the breach of contract claim, and (4) that the complaint fails to allege scienter with sufficient particularity pursuant to Fed. R. Civ. P 9(b). A review of the complaint in light of relevant authority leads to the conclusions that (1) McKelvey's statement as to PJI's present wherewithal was not puffery, (2) the economic loss rule does not apply to this allegedly fraudulent statement, (3) the fraud claim is distinguishable from plaintiff's contract claim, and (4) the complaint has adequately plead scienter.

---

5. *See JSC Foreign Econ. Ass'n Technostroyexport v. International Dev. & Trade Servs., Inc.,* 295 F.Supp.2d 366, 379 (S.D.N.Y.2003) (denying 12(b)(6) motion on the grounds that the complaint contained factual allegations as to both elements of the veil-piercing claim); *Fugazy Int'l Travel Group, Inc. v. Stargazer, Ltd.,* No. 02 Civ. 3373(HB), 2003 WL 115220 at *3 (S.D.N.Y. Jan.10, 2003) (holding that corporate officer who knowingly causes a trade-

mark infringement is personally liable *"without regard to piercing the corporate veil"*) (emphasis in original); *Accordia Northeast, Inc. v. Thesseus Int'l Asset Fund, N.V.,* 205 F.Supp.2d 176, 182 (S.D.N.Y.2002) (denying dismissal that plaintiff had plead facts as to both elements of the veil-piercing claim); *Rolls–Royce,* 929 F.Supp. at 122 (same); *Citicorp Int'l Trading Co. v. Western Oil & Ref. Co.,* 771 F.Supp. at 608 (same).

### 1. *McKelvey's Statement Concerning PJI's Present Wherewithal are Actionable*

EED alleges that McKelvey made three fraudulent statements at the 2001 New York Yacht Club meeting: (1) that PJI "would be building the 'greatest boats'" (Compl. ¶ 14); (2) that PJI "had the capability and wherewithal to properly construct the yacht sought by Goldman in a timely manner" (*id.*); and (3) that McKelvey "was personally 'committed to PJI.'" (*id.*). McKelvey argues that all three of these statements are non-actionable puffery.

It is well established in New York that "a seller's mere general commendations of the product sought to be sold, commonly known as 'dealer's talk,' 'sales talk,' or 'puffery,' do not amount to actionable misrepresentations[.]" 60A William H. Danne, Jr., *N.Y. Jur.* § 34 (2d ed. 2003) ("*N.Y.Jur.*") (collecting cases). However, the doctrine of non-actionability for puffery does not apply "to false representations of material facts which are in their nature calculated to deceive and are made with the intent to deceive." 60A *N.Y. Jur.* § 34 (collecting cases).

The first and third of the statements allegedly made by McKelvey during the course of the 2001 New York Yacht Club meeting are not actionable because they are mere expressions of advertising, a well recognized form of puffery. *See, e.g., Quasha v. American Natural Beverage Corp.,* 171 A.D.2d 537, 567 N.Y.S.2d 257 (1st Dep't 1991) (dismissing fraud claim where documents withheld from plaintiff "contain nothing more than speculation, advertising puffery and the defendants' hopes for the future of the company"); *Simon v. Cunard Line Ltd.,* 75 A.D.2d 283, 288, 428 N.Y.S.2d 952, 955 (1st Dep't 1980) (representation that the QEII was "the greatest ship in the world" was "mere puffing and not actionable").

In contrast, the second of the three statements involves McKelvey's alleged misrepresentation as to the present condition of defendant PJI's finances and operations. As such, this statement is not mere puffery. It is actionable as fraud. *See e.g., Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (stating that under New York law, defendant's alleged intentional overstatements of its net income and the value of its current and capital assets were actionable as fraud); *Channel Master Corp. v. Aluminim Ltd. Sales,* 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833 (1958) (holding that defendant's allegedly false statement that it had the capacity to sell to plaintiff 400,000 pounds of aluminum was actionable as fraud).

The cases cited by the defendants to support their puffery argument all involved types of statements that are analytically distinct from the one at issue here. One group of cases cited by the defendants addressed the actionability of general claims made in the context of advertisements to the general public. *See, e.g., Sample, Inc. v. Pendleton Woolen Mills, Inc.,* 704 F.Supp. 498, 505 (S.D.N.Y.1989) (defendant's advertisement offering "relationships that last a lifetime" constituted non-actionable puffery); *Serbalik v. General Motors Corp.,* 246 A.D.2d 724, 726 667 N.Y.S.2d 503, 504 (3d Dep't 1998) (defendant's advertisement claiming that car "would perform excellently" constituted mere puffery); *Scaringe v. Holstein,* 103 A.D.2d 880, 881, 477 N.Y.S.2d 903, 904 (3d Dep't 1984) (defendant's advertisement claiming that car was in "excellent condition" constituted puffery). A second group of cases cited by the defendants holds that projections of future earnings are not generally actionable. *See Rombach v. Chang,*

355 F.3d 164, 174 (2d Cir.2004) (holding that a financial analyst's earning projections were non-actionable under federal securities law); *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (stating that under federal securities law, forward-looking statements are not actionable merely because they turn out to be misguided); *Highlands Insurance Co. v. PRG Brokerage, Inc.*, No. 01 Civ. 2272(GBD), 2004 WL 35439, *3, 2004 U.S. Dist. LEXIS 83, at *12 (S.D.N.Y. Jan. 5, 2004) (holding that defendants' promises concerning future profitability are not actionable as fraud under New York law); *Sheth v. New York Life Insurance Co.*, 273 A.D.2d 72, 74, 709 N.Y.S.2d 74, 75 (1st Dep't 2000) (holding that claims based on "conclusory" statements and opinions of "future expectations" are not actionable as fraud); *Quasha*, 171 A.D.2d 537, 567 N.Y.S.2d 257 (holding that statements concerning "hopes for the future of the company" are not actionable as fraud).[6]

In short, McKelvey's specific misrepresentations concerning the wherewithal of PJI is a proper basis for a fraud claim.

## 2. *The Fraud Claim Does Not Violate the Economic Loss Rule*

██ New York's economic loss rule restricts "plaintiffs who have suffered 'economic loss,' but not personal or property injury, to an action for the benefits of their bargain. If the damages suffered are of the type remediable in contract, a plaintiff may not recover in tort." *Carmania*

*Corp., N.V. v. Hambrecht Terrell Int'l*, 705 F.Supp. 936, 938 (S.D.N.Y.1989); *see also Schiavone Constr. Co. v. Elgood Mayo Corp.*, 56 N.Y.2d 667, 669, 436 N.E.2d 1322, 1323, 451 N.Y.S.2d 720, 721 (1982) (holding that under the economic loss rule, if an alleged product malfunction is alleged to have caused purely economic loss, then the end-purchaser is limited to contract claims against the manufacturer and may not seek damages in tort).

McKelvey argues that pursuant to the economic loss rule, plaintiff cannot assert a fraud claim alongside a contract claim unless personal injury or property damage has been alleged. In support of this premise, McKelvey relies heavily on a single decision from this district, *Orlando v. Novurania of Am., Inc.*, 162 F.Supp.2d 220, 225 (S.D.N.Y.2001). In *Orlando*, the disappointed buyer of a boat that developed cracks in its hull sued the seller/manufacturer, asserting, *inter alia*, both contract and fraud claims. With regard to the fraud claim, the plaintiff alleged that the defendant's false representations prior to the time that the sales contract was entered induced the purchase of the boat. The *Orlando* court held that plaintiff's fraud claim, which it determined to be "separate and distinct" from the contract claim, *id.* at 225, was nonetheless barred by New York's economic loss rule. However, the *Orlando* court failed to identify any New York cases addressing the applicability of the economic loss rule to a fraud claim. Rather, it reasoned that since New York courts had failed to carve out any

---

**6.** Defendants also cite two cases involving omissions of facts, *see Elghanian v. Harvey*, 249 A.D.2d 206, 206–07 671 N.Y.S.2d 266 (1st Dep't 1998); *Lesavoy v. Lane*, 304 F.Supp.2d 520, 530 (S.D.N.Y.2004), in support of an argument that McKelvey had no duty to disclose PJI's financial difficulties to Goldman/EED. Regardless of whether such a duty existed, this argument ignores the fact that EED's fraud claim is premised on McKel-

vey's affirmative misrepresentations. Furthermore, once McKelvey made claims as to PJI's wherewithal, he was Obligated not to omit material facts. *See Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 155 (2d Cir.1995) ("In business negotiations, an affirmative duty to disclose material information may arise from the need to complete or clarify one party's partial or ambiguous statement.").

applicable exceptions to the rule, it must be interpreted to bar a fraud claim for pure economic loss. *Id.* at 226.

This Court has previously declined to adopt the *Orlando* court's reasoning, holding instead that "[i]n the absence of any articulation to the contrary by the New York courts, the economic loss doctrine will not be presumed to extend to fraud claims." *Computech Int'l Inc. v. Compaq Computers Corp.*, No. 02 Civ. 2628(RWS), 2004 WL 1126320 at *10 (S.D.N.Y. May 21, 2004) (observing that "[t]he parties have not cited to any case in the New York courts applying the economic loss doctrine to an intentional tort, nor has one been found by the Court. [citations omitted]"). McKelvey has failed to point to any such cases,[7] and this Court's renewed canvas of New York cases once again reveals no authority for the application of the economic loss doctrine to claims, such as this one, that sound in fraud.

Moreover, as discussed in greater detail below, New York courts have routinely permitted fraud and contract claims to proceed in tandem for the purpose of recovering pure economic loss. *See, e.g., Deerfield Comm. Corp. v. Chesebrough–Ponds, Inc.*, 68 N.Y.2d 954, 956, 502 N.E.2d 1003, 1004, 510 N.Y.S.2d 88, 89 (1986) (affirming lower court's denial of motion to dismiss fraudulent concealment counterclaim where another counterclaim sounded in contract and the only alleged damages were purely economic); *First Bank of Americas v. Motor Car Funding, Inc.*, 257 A.D.2d 287, 291, 690 N.Y.S.2d 17, 21–22 (1st Dep't 1999); *Steigerwald v. Dean Witter Reynolds, Inc.*, 107 A.D.2d 1026, 1027, 486 N.Y.S.2d 516, 518 (4th Dep't 1985).

■ Based on the foregoing, the Court concludes that the economic loss rule presents no bar to the assertion of EED's fraud claim.

### 3. The Fraud and Breach of Contract Claims are Distinguishable

■ Defendants argue that Plaintiff's tort claims should be dismissed because the fraud claim is indistinguishable from the breach of guaranty claim. Under New York law, a fraud cause of action generally does not arise where the alleged fraud merely relates to a breach of contract. *Salvador v. Uncle Sam's Auctions & Realty, Inc. ex rel. Passonno*, 307 A.D.2d 609, 611, 763 N.Y.S.2d 360, 362 (3d Dep't 2003); *River Glen Assocs., Ltd. v. Merrill Lynch Credit Corp.*, 295 A.D.2d 274, 275, 743 N.Y.S.2d 870, 871 (1st Dep't 2002); *Bazerman v. Edwards*, 295 A.D.2d 115, 742 N.Y.S.2d 822 (1st Dep't 2002). However, this general rule is subject to the corollary that "a party who has breached a contract may be charged with separate tort liability for fraud arising from a breach of duty that is distinct from, or in addition to, the breach of contract." 60A *N.Y. Jur.* § 7 (citing *Freedman v. Pearl-*

---

7. The cases cited by defendants on this point all stand for the uncontroversial (and entirely irrelevant) proposition that the economic loss rule prevents the assertion of negligence or strict liability claims where plaintiff's injury is purely economic. *See PPI Enterprises (U.S.), Inc. v. Del Monte Foods Co.*, No. 99 Civ. 3794(BSJ), 2003 WL 22118977 at *27 (S.D.N.Y. Sept.11, 2003) (dismissing negligence claim for failure to claim personal injury or property damage); *Robehr Films, Inc. v. American Airlines, Inc.*, No. 85 CIV. 1072(RPP), 1989 WL 111079 (S.D.N.Y. Sept.19, 1989) (denying motion to amend complaint to add negligence claim alleging economic loss only); *Carmania Corp.*, 705 F.Supp. at 939 (dismissing malpractice and negligent misrepresentation claims based on pure economic loss); *Schiavone*, 56 N.Y.2d at 669, 436 N.E.2d at 1323, 451 N.Y.S.2d at 721 (reversing grant of leave to amend to add strict liability claim for pure economic injury).

*man,* 271 A.D.2d 301, 304 706 N.Y.S.2d 405, 408 (1st Dep't 2000); *Licette Music Corp. v. A.A. Records, Inc.,* 196 A.D.2d 467, 601 N.Y.S.2d 297, 297–98 (1st Dep't 1993); *Steigerwald,* 107 A.D.2d at 1027, 486 N.Y.S.2d at 518 (4th Dep't 1985); *Bernstein v. Polo Fashions, Inc.,* 55 A.D.2d 530, 531, 389 N.Y.S.2d 368, 370 (1st Dep't 1976)).

██ In particular, it is well established that a misrepresentation of present fact which is the inducement for a contract is collateral to said contract, and can support a separate fraud claim. *See, e.g., Deerfield,* 68 N.Y.2d at 956, 502 N.E.2d at 1004, 510 N.Y.S.2d at 89; *see also Primavera Familienstifung v. Askin,* 130 F.Supp.2d 450, 491, *reconsidered on other grounds,* 137 F.Supp.2d 438 (S.D.N.Y.2001) (stating that "a false representation that induces one to enter into a contract supports a fraud claim"); *First Bank of Americas v. Motor Car Funding,* 257 A.D.2d 287, 292, 690 N.Y.S.2d 17, 21 (1st Dep't 1999) ("[A] misrepresentation of present facts is collateral to the contract (though it may have induced the plaintiff to sign the contract) and therefore involves a separate breach of duty.").

██ Here, the contract claim seeks to recover the damages sustained by EED as a result of the breaches of the Construction Agreement by PJI, based on the Guaranty executed by PJAC. (*See* Compl. ¶¶ 36–38). In contrast, the fraud claim seeks to recover the damages EED has allegedly sustained as a result of being induced to enter into the Construction Agreement by McKelvey's alleged misrep-

resentations of fact concerning the present conditions of PJI's finances and operations. These statements, which allegedly were made to induce the contract, are collateral to the actual terms of the contract. Furthermore, the damages that EED seeks to recover in its fraud claim are distinct from the "benefit of the bargain" damages sought in the contract claim. While there is no specification of these damages in the complaint, no such specification is required. *See G–I Holdings Inc. v. Baron & Budd,* 179 F.Supp.2d 233, 269 (S.D.N.Y.2001).[8]

### 4. *The Fraud Claim Satisfies Rule 9(b)*

Fed.R.Civ.P. 9(b) states that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The Second Circuit "has read Rule 9(b) to require that a complaint '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Rombach,* 355 F.3d at 170 (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)).

██ With respect to the alleged misrepresentations concerning PJI's present financial and operational capacity, McKelvey does not dispute that the complaint satisfies the first three requirements set forth in *Mills.* Rather, McKelvey contends only that the complaint does not meet the fourth requirement, arguing that EED has not alleged facts that "give rise

---

8. In *G–I Holdings,* this Court stated that,

> to sustain a claim for fraudulent inducement alongside a claim for breach of contract, one must plead *any* one of the following: (i) a legal duty separate from the duty to perform under the contract; or (ii) a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) special damages that are caused by the misrepresentation and unrecoverable as contract damages.

179 F.Supp.2d at 269 (emphasis added) (citing *Blank v. Baronowski,* 959 F.Supp. 172, 180 (S.D.N.Y.1997)).

to a strong inference of fraudulent intent," as required by Second Circuit decisions. *See, e.g., San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 812 (2d Cir.1996). However, the "strong inference" requirement is tempered by the recognition that a plaintiff "cannot be expected to plead a defendant's actual state of mind[,]" and thus need not allege the defendant's requisite intent with any great specificity. *Chill v. General Elec. Co.,* 101 F.3d 263, 267 (2d Cir.1996); *Cohen,* 25 F.3d at 1173 stating that under Rule 9(b), (" 'plaintiffs have the burden of pleading circumstances that provide at least a minimal factual basis for their conclusory allegations of scienter' ") (quoting *Connecticut National Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987)); *Jordan (Bermuda) Inv. Co. v. Hunter Green Invs. Ltd.,* 154 F.Supp.2d 682, 692 (S.D.N.Y.2001) (stating that "Rule 9(b) requires that a plaintiff plead the intent element of fraud only in general terms").

■ Although EED has suggested in its papers that McKelvey intended a Ponzi scheme (EED's Memorandum of Law, p. 13), that allegation is absent from the complaint. However, a plaintiff can establish a strong inference of fraudulent intent "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Chill,* 101 F.3d at 267 (quoting *Shields,* 25 F.3d at 1128). Here, the complaint contains specific allegations (1) that PJI was experiencing financial difficulties and undercapitalization at the time of McKelvey's meeting with Goldman, and (2) that McKelvey had knowledge of such difficulties. (Compl.¶¶ 11–12, 15). Such allegations satisfies the scienter pleading requirement. *See Degulis v. LXR Biotechnology, Inc.,* 928 F.Supp. 1301, 1312 (S.D.N.Y.1996) (holding that the scienter pleading require-

ment was satisfied simply by alleging that the defendants were directors of companies that disseminated misleading financial information); *Sperber Adams Assoc. v. JEM Management Assoc. Corp.,* No. 90 Civ. 7405(JSM), 1992 WL 138344 at *4 (S.D.N.Y. Jun.4, 1992) (holding that scienter was adequately plead where private placement memoranda and investment summaries were alleged to contain material omissions and defendants were alleged to have prepared such documents) (citing *IIT v. Cornfeld,* 619 F.2d 909, 923–24 (2d Cir.1980) (holding that scienter was sufficiently plead where the complaint included both general allegations of knowledge of a fraud and specific allegations of misrepresentations)).

Therefore, EED has adequately pled a fraud claim against McKelvey arising out of the statement relating to PJI's present financial and operational wherewithal.

### E. *The Negligent Misrepresentation Claim Is Dismissed*

Under New York law, the elements of a claim for negligent misrepresentation are that:

(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

*Greenberg v. Chrust,* 198 F.Supp.2d 578, 584 (S.D.N.Y.2002) (citing *Hydro Investors, Inc. v. Trafalgar Power Inc.,* 227 F.3d 8, 20 (2d Cir.2000)).

Defendants have moved for dismissal of EED's negligent misrepresentation claim

on the grounds that (1) there was no privity or near privity between McKelvey and EED and (2) that there was no special relationship between these parties.

The New York Court of Appeals has held that "a special duty giving rise to a negligent misrepresentation claim must arise out of a contract or some ... relationship approaching ... privity of contract." *Id.* (citing *Parrott v. Coopers & Lybrand, L.L.P.*, 95 N.Y.2d 479, 483 718 N.Y.S.2d 709, 711 741 N.E.2d 506, 508 (2000)). The Court of Appeals has set forth the following criteria for determining the existence of a "near privity" relationship: (1) defendant's awareness that the statement in question was to be used for a particular purpose, (2) reliance on the statement by some identifiable parties in furtherance of that purpose, and (3) some conduct linking defendant to the parties and evincing defendant's awareness of their reliance. *Ossining Union Free School Dist. v. Anderson*, 73 N.Y.2d 417, 425, 541 N.Y.S.2d 335, 339, 539 N.E.2d 91, 95 (1989). Applying this criteria to EED's allegations concerning the meeting between McKelvey and Goldman at the New York Yacht Club, EED has sufficiently plead the existence of a near-privity relationship. It should be noted that the case cited by defendants in support of the proposition that EED has failed to satisfy this pleading requirement is inapposite because it addresses the separate question of

whether a plaintiff had come forward with sufficient proof to avoid summary judgment. *See Security Pac. Bus. Credit, Inc. v. Peat Marwick Main & Co.*, 79 N.Y.2d 695, 705, 586 N.Y.S.2d 87, 92, 597 N.E.2d 1080, 1085 (1992).

The next step in New York's negligent misrepresentation analysis is to determined whether this near-privity relationship imparted a duty on McKelvey to provide correct information. Under New York law, a statement made in the context of an arms-length commercial transaction, without more, cannot give rise to such a duty. *See Kimmell v. Schaefer*, 89 N.Y.2d 257, 263, 652 N.Y.S.2d 715, 719, 675 N.E.2d 450, 454 (1996).[9] Rather, an arms-length commercial transaction can only give rise to a negligent misrepresentation claim if a special relationship exists between the parties such that plaintiff's reliance on defendant's representation was justifiable. *Id.* A special relationship can arise where the defendant either (1) possesses "unique or specialized expertise" or (2) occupies a "special position of confidence and trust" with the injured party. *Id.*

EED has relied on *Kimmell* as authority to establish that McKelvey possessed unique and special expertise with regard to the PJI/EED transaction. The *Kimmell* court upheld a judgment against a corporate officer/director on the grounds that he made negligent misrepresentations

9. The *Kimmell* court made clear that the vast majority of arms-length commercial transactions, which are comprised of "casual statements and contacts" will not give rise to negligent misrepresentation claims. *See Kimmell*, 89 N.Y.2d at 263, 652 N.Y.S.2d at 719, 675 N.E.2d at 454. Since *Kimmell*, New York courts have followed the general rule of non-actionability for negligent misstatements made in the context of arms-length business transactions. *See, e.g., Sheridan v. Trustees of Columbia Univ.*, 296 A.D.2d 314, 316, 745 N.Y.S.2d 18, 19 (1st Dep't 2002) (negligent

misrepresentation claim dismissed "since, at the time of the alleged misrepresentation, the parties were clearly acting at arm's length"), *leave to appeal denied*, 99 N.Y.2d 505, 755 N.Y.S.2d 711, 785 N.E.2d 733, *cert. denied*, 539 U.S. 904, 123 S.Ct. 2253, 156 L.Ed.2d 112 (2003); *WIT Holding Corp. v. Klein*, 282 A.D.2d 527, 529, 724 N.Y.S.2d 66, 68 (2d Dep't 2001) (modifying court order to dismiss negligent misrepresentation claim on grounds that arm's length business relationship had not given rise to special relationship.).

to investors that he had solicited into a limited partnership. *Kimmell,* 89 N.Y.2d at 266, 652 N.Y.S.2d at 720, 675 N.E.2d at 455. The false statements at issue were a series of written and oral profit projections provided by the defendant to the plaintiffs. *Kimmell,* 89 N.Y.2d at 261, 652 N.Y.S.2d at 717–18, 675 N.E.2d at 452–53. The defendant apparently urged the plaintiffs on multiple occasions to rely on the accuracy of these projections. *Id.*

The *Kimmell* defendant was an attorney and certified public accountant ("CPA") who had formerly served as chief financial officer ("CFO") for Pepsico. *Id.* During the relevant time period, he served as chair and CFO of Cogenic Energy Systems, Inc ("CESI"). *Id.* Furthermore, the plaintiffs knew that defendant had been the general partner in similar previous ventures and apparently assumed that he possessed unique business and operational knowledge concerning the venture that the plaintiffs had been recruited into. *Kimmell,* 89 N.Y.2d at 265, 652 N.Y.S.2d at 719, 675 N.E.2d at 454.

■ Based on these facts—*i.e.,* defendant's calculated and repeated efforts to disseminate his statements to the plaintiffs, his efforts to induce reliance on these statements, and plaintiffs' knowledge of defendant's unique professional skills and business experience—the *Kimmell* court determined that a special relationship had arisen between the parties.

McKelvey is not alleged to have any special professional training or past business experience that would have given him the type of unique expertise possessed by the *Kimmell* defendant. The complaint does not allege that he was personally involved in the operations of PJI, or that he claimed to have expertise in the design, construction, or financing of yachts or any aspect of yacht-building. There is no allegation that EED believed that McKelvey had unique professional ability or expertise. Further-more, McKelvey's alleged casual statement to Goldman is analytically distinct from the *Kimmell* defendant's communications campaign, which was calculated to induce reliance.

Because no special relationship has been adequately alleged, the negligent misrepresentation claim is dismissed.

## F. *The Motion To Transfer Is Denied*

The PJAC motion, pursuant to 28 U.S.C. § 1404(a), to transfer this action to the Eastern District of Wisconsin, where PJI constructed the yacht for Goldman, raises the customary issue of balancing:

> (1) the plaintiff's choice of forum; (2) the locus of the operative facts; (3) the convenience and relative means of the parties; (4) the convenience of witnesses; (5) the availability of process to compel the attendance of witnesses; (6) the location of physical evidence, including documents; (7) the relative familiarity of the courts with the applicable law; (8) the interests of justice, including the interests of trial efficiency.

*Billing v. Commerce One, Inc.,* 186 F.Supp.2d 375, 377 (S.D.N.Y.2002). It appears that as between these parties, the balance tips slightly in PJAC's favor at this early stage of the action. However, since the fraud claim against McKelvey remains and since McKelvey has not sought transfer, such transfer is not warranted. *See Chrysler Credit Corp. v. Country Chrysler, Inc.,* 928 F.2d 1509, 1518 (10th Cir.1991) (stating that "[s]ection 1404(a) only authorizes the transfer of an entire action, not individual claims.").

The motion to transfer is therefore denied.

## *Conclusion*

The motion to dismiss the Guaranty cause of action against PJAC for want of

personal jurisdiction is denied at this time with leave to move for summary judgment after jurisdictional discovery has been completed. The motion to dismiss the veil piercing/alter ego cause of action is granted. The motion to dismiss the fraud cause of action against McKelvey as to his statement concerning PJI's wherewithal is denied but granted as to the remaining statements. The motion to dismiss the negligent misrepresentation cause of action is granted. The motion to transfer is denied.

EED is granted leave to replead within twenty (20) days.

It is so ordered.